## NATIONAL SURETY CO. v. GLOBE GRAIN & MILLING CO.

(Circuit Court of Appeals, Ninth Circuit. February 25, 1919. Rehearing
Denied May 12, 1919.)

### No. 3209.

1. APPEAL AND ERROR ⬮1008(1)—REVIEW—FINDINGS.

In an action tried to the court, findings of fact are conclusive on the
appellate court, though it might have reached a different conclusion on
the evidence.

2. INSURANCE ⬮285—FIDELITY INSURANCE—RECOVERY.

Where an employer's application set out that no fact had come to the
employer's knowledge tending to indicate an employé was unreliable,
deceitful, dishonest, or unworthy of confidence, and no reason why a
surety company should not become a surety, and the surety company
issued a policy to make good any loss the employer might sustain by any
act of personal dishonesty, forgery, or embezzlement by the employé, the
employer could not recover on the policy, where the employer knew the
employé had previously overdrawn his accounts, and the books of a
branch office in his charge showed further overdrafts.

In Error to the District Court of the United States for the South-
ern Division of the Southern District of California; Oscar A. Trippet,
Judge.

Action by the Globe Grain & Milling Company against the National
Surety Company. There was a judgment for plaintiff, and defendant
brings error. Reversed and remanded, with directions to enter judg-
ment for defendant.

O'Melveny, Millikin & Tuller and Hocker & Austin, all of Los
Angeles, Cal., for plaintiff in error.

W. G. Van Pelt and E. S. Williams, both of Los Angeles, Cal., for
defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. The defendant in error applied to the plain-
tiff in error to become surety, beginning October 15, 1915, for certain
of its employés for the amounts and in the positions set opposite their
names, respectively, including one T. F. Hayes.

"These employés, and each and every of them, while in the service of the
undersigned employer," the application expressly declared, "have always
performed their respective duties in a faithful and satisfactory manner.
There has never come to the notice or knowledge of the employer any act,
fact, or information tending to indicate that they or any of them are negli-
gent, unreliable, deceitful, dishonest, or unworthy of confidence. As far as
the employer knows, the habits of each and all of them are good, and the em-
ployer knows no reason why you cannot safely become surety for them and
each of them.

"The above and foregoing statement and representations are each, every,
and all warranted by the employer to be true, and are made for the purpose
of inducing the National Surety Company to become such surety, and said
statements and representations shall apply to each and every employé here-
after added to the schedule to be covered by said bond as therein provided.

"Dated at Los Angeles the 15th day of October, 1915."

⬮For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Upon that application the plaintiff in error issued its policy to the defendant in error in consideration of the payment of an annual premium computed at an agreed rate and payable on the 15th day of October during each and every year that the bond should continue in force, agreeing "to make good within sixty (60) days after satisfactory proof thereof, to the Globe Grain & Milling Company, of Salt Lake City, Utah, employer, any loss which the employer may sustain by reason of any act of personal dishonesty, forgery, theft, larceny, embezzlement, wrongful conversion, or abstraction on the part of any employé named in the schedule" attached, including said Hayes, the amount of whose bond was $5,000. Subsequent to the issuing of the bond Hayes embezzled from the defendant in error $5,000, resulting in the present action by it to recover of the insurance company the amount so embezzled, with costs.

The case was tried before the court without a jury by stipulation of the parties, and resulted in certain findings of fact upon which judgment was entered in favor of the insured.

[1] Allegations of fact made in defense of the action, to the effect that Hayes drank to excess, was accustomed to overdraw his account with the milling company, and was an habitual gambler on horse races and at poker prior to the giving of the insurance, with the knowledge of the president of the insured, were negatived by the findings made by the trial court, and under the well-established rule such findings are conclusive upon us, however convincing we might otherwise consider the argument of the plaintiff in error that upon the evidence such findings should have been otherwise. Tyng v. Grinnell, 92 U. S. 467, 23 L. Ed. 733; Dooley v. Pease, 180 U. S. 126, 21 Sup. Ct. 329, 45 L. Ed. 457; Meyer v. Everett P. & P. Co., 193 Fed. 857, 863, 113 C. C. A. 643.

[2] The court below, however, found these further facts to be true: That when Hayes (who had been the agent of the milling company at Woodland, Cal., before being transferred as its agent at Salt Lake, Utah) left Woodland he was overdrawn in his accounts in the sum of about $812.68, which overdrawing had been expressly permitted by the milling company, and was in the nature of a loan by it to him; that the same was not communicated by the milling company or any of its officers to the insurance company, which made no inquiry as to any indebtedness owing by Hayes to the milling company; that when Hayes was sent by the milling company to Woodland he stated to the president of that company that on account of some business ventures in which he had been formerly engaged in Mexico he had lost some money and was in debt and was obliged to make certain payments, and therefore asked the president of the milling company to be allowed to overdraw his account while at Woodland, which request was granted, and that he was so overdrawn when he left Woodland in the sum of $812.-68, besides which he then owed the milling company $500 on a note, advanced to him by the milling company in order to enable him to maintain a loan at the Merchants' National Bank of Los Angeles for $2,500, which latter loan was secured by stock held by Hayes in a corporation operating in Mexico; that between September, 1914, when Hayes left Woodland, and the 1st of December, 1915, the overdraft

was reduced to $304.32, and that, including the $500 note, he was on the day last mentioned indebted to the milling company in the sum of $804.32; that when he was sent to Salt Lake the permission theretofore given him to overdraw his account was withdrawn by the president of the milling company, who had, however, always implicitly believed in his integrity and honesty; that after the said Hayes went to Salt Lake City as such agent, and particularly after February 1, 1916, he abstracted, used, and applied the money of the milling company in betting on horse races, in buying grain on margins in the grain market, and otherwise for his own personal use, of which, however, the milling company had no notice until May 31, 1916, at which time it immediately discharged him from its employment; that on or about March 1, 1916, a balance sheet dated February 29, 1916, prepared by or under the direction of Hayes at his office in Salt Lake City, showing assets and liabilities of the milling company at its Salt Lake agency and containing an item marked "Personal Accounts, $3,239.70," was received through the mail at the office of the milling company at Los Angeles, from the office of Hayes at Salt Lake; that the time when such statement was delivered through the mail was not the time when the outside agencies of the milling company were expected or required to report to its Los Angeles office, and was not looked for there; that such statement was received by a clerk of the milling company at its Los Angeles office, whose duties were those of assistant auditor, and was filed by him without any examination, and without calling it to the attention of any of the officers of the milling company; that while it did not so appear in the said statement of the said item of $3,239.70 marked as "Personal Accounts," $1,099.02 was then an overdraft of Hayes at the Salt Lake office, and the balance of the said sum of $3,239.70 consisted of sundry personal items owing to the milling company in the regular course of business by various customers with whom it was doing business at its Salt Lake office; that the entry "Personal Accounts" in the balance sheet, which was a printed form prepared by the milling company for general use throughout its business, both at Los Angeles and its branches, was not intended to, and did not, show merely the personal account of the agent of the company in the place where the statement was made, but might, and was intended to, and did, show the personal accounts of other parties owing to the company in the regular course of business, as well as general expense accounts and other items of expense incurred by the agent or representative of the company in the regular course of his business for and on behalf of the company; that it was customary and regular for large amounts to be entered under that caption in such reports, which had nothing to do with the personal standing or account of the agent at the agency where the statement was prepared; that the said statement of February 29, 1916, was the only statement or report sent by Hayes to the milling company, from October 15, 1915, to May 31, 1916, except statements relative to his grain purchases and sales in the regular course of his business for the company; that all of the abstractions of Hayes at the Salt Lake office were entered by him on the books of the company, and that credits he placed on those books

consisted at times of winnings by him on horse races or on marginal transactions in the stock or in the grain market, but no part of the same was ever known to the company, and that between October 15, 1915, and May 31, 1916, the milling company never checked or audited or examined the books of Hayes at the Salt Lake office, and did not know their contents in any respect; that neither the company nor its officers ever knew that Hayes was overdrawing his account at the Salt Lake office until May 31, 1916.

The evidence shows without conflict (and the same is without conflict with any of the findings) that it was the custom of the milling company to permit its employés to overdraw their accounts, but that when Hayes was sent to Utah that permission was expressly withdrawn from him. He was first sent there in the early part of January, 1915, by the milling company to buy grain for it, returning to Los Angeles several times between that time and the month of July of the same year, during which month he returned to the company's Salt Lake office with instructions to there open a set of books, and where the company established a branch office and a bank account about September 15th, with Hayes in charge. From that time to May 31, 1916, there was never any audit made of the company's books kept by Hayes at Salt Lake. It will be seen, therefore, that notwithstanding the peculations of Hayes were entered by him on the books of the company, and could have been easily discovered by their examination, no examination of them whatever was made by the company, and it did not even know of the overdrawing of his account, contrary to the express order of its president, until May 31, 1916.

Can it be properly held that the company was not bound to know that its books showed upon their face the embezzlement of its funds by one of the employés, the honesty of whom it applied to the plaintiff in error to insure, upon an application which expressly warranted the truth of its statement that there had never come to its notice or knowledge any act, fact, or information *tending to indicate* that he was negligent, unreliable, deceitful, dishonest, or unworthy of confidence, and that it knew no reason why the insurance company could not safely become surety for him? We think not. Beyond question, the defendant in error knew that the permission it had, along with its other employés, theretofore accorded Hayes of overdrawing his account, was expressly withdrawn from him when he was sent to Utah, and beyond question the company's own books kept by him at its Salt Lake office showed upon their face his embezzlement of the funds of the company at the very time it applied to the plaintiff in error for the insurance in question. Under such circumstances, we are of the opinion that the applicant cannot be heard to say that it did not know what its own books showed, especially in view of the fact that there must have been some reason for the express withdrawal by the defendant in error, when it sent Hayes to Utah, of the privilege of overdrawing his account, which it had theretofore accorded him along with its other employés. We think the case fairly comes within the true doctrine of the case of Guarantee Co. v. Mechanics', etc., Co., 183 U. S. 402, 22 Sup. Ct. 124, 46 L. Ed. 253, and accordingly—

The judgment is reversed, and cause remanded to the court below, with directions to enter judgment for the defendant, with its costs.

GILBERT and MORROW, Circuit Judges (concurring). We are of the opinion that the judgment should be reversed, and that upon the findings of the court below judgment should be directed to be entered in favor of the plaintiff in error upon the following grounds:

Prior to the date of the application for insurance, Hayes had been in the service of the insured for more than five years, and during the whole of that time he had been permitted to overdraw his account. No restriction was placed upon the amount which he might overdraw; the permission being to overdraw in a "reasonable amount." After being in the service of the insured at Woodland, Cal., for several years, he was transferred in January, 1915, to Salt Lake City, where he remained until he was discharged. At the date of the application, October 15, 1915, his account at Woodland was overdrawn in the sum of $717.-13, in addition to which he owed the insured upon a note $500, which was originally an overdraft, and he was overdrawn on his Salt Lake account in the sum of $432.93. He testified that, when he was discharged on June 1, 1916, his account was overdrawn about $6,600. His heaviest overdraft at any time at Woodland was $1,154.33 in excess of the $500 note. Blewett, the assistant auditor of the insured, checked up Hayes' account before he went to Salt Lake and he testified: "I knew then that he was overdrawn too much." The president of the insured stated to the general auditor of the surety company that "Hayes being short $1,000 or so in Woodland was entirely different from his being short $7,000 or $8,000 in Salt Lake City." If there was a difference, it was but a difference in degree. Hayes, having been permitted habitually to overdraw his account prior to going to Salt Lake, thereafter continued to indulge his habit and largely increased his overdraft. No examination of his account was made while he was at Salt Lake.

The parties to the contract were not on a plane of equal opportunity for information, and the fact that Hayes' account was overdrawn, and that he was in the habit of overdrawing the same at and before the time when the contract was entered into, was one that should not have been withheld from the surety company. It is not conceivable that the surety, if advised of that habit, would have entered into the contract. In Frost on Guaranty Insurance, § 74, it is said:

• "The chronic defaulter, for the purpose of becoming a 'risk' under a fidelity insurance policy, is persona non grata to the insurer. The surety companies, as a matter of prudence and business policy, invariably decline a 'risk' who has been seriously in arrears in any previous employment. The reasonableness of this position has never been questioned, either by the courts or the public, so far as we are aware."

Where the insured states in its application that nothing is known concerning the employé's habits affecting his title to confidence, when the fact was the employé was engaged in hazardous speculation with the knowledge of the insured, there can be no recovery upon the bond. United States Fidelity & Guaranty Co. v. Blackly Hurst & Co., 117 Ky.

127, 77 S. W. 709. In Belleview L. & B. Ass'n v. Jeckel, 104 Ky. 159, 46 S. W. 482, it was held that if a party taking a guaranty from a surety conceals from him facts which go to increase his risk, and suffers him to enter into the contract under false impressions as to the real state of facts, such concealments will amount to a fraud, because the party is bound to make the disclosure, and the omission to make it, under the circumstances, is equivalent to an affirmation that the facts do not exist. Of similar import is Deposit Bank of Midway's Assignee v. Hearne, 104 Ky. 819, 48 S. W. 160; Hebert v. Lee, 118 Tenn. 133, 101 S. W. 175, 12 L. R. A. (N. S.) 247, 121 Am. St. Rep. 989, 11 Ann. Cas. 1029.

"There is no principle of law better settled than that persons proposing to become sureties to a corporation for the good conduct and fidelity of an officer to whose custody its moneys, notes, bills, and other valuables are intrusted, have the right to be treated with perfect good faith. If the directors are aware of secret facts materially affecting and increasing the obligation of the sureties, the latter are entitled to have these facts disclosed to them." Morse on Banking, p. 226.

Not only was there failure to disclose to the surety company the habitual overdraft of Hayes, but the application for the fidelity bond contained statements, warranted to be true, one of which was: That there had never come to the notice or knowledge of the employer any act, fact, or information tending to indicate that the employé was unworthy of confidence, and that his employer knew "no reason why you cannot safely become surety for him." We think that there was a clear breach of the warranty of want of knowledge of facts tending to indicate that Hayes was worthy of confidence, and of the warranty that his habits were good, and that his employer knew of no reason why the bonding company should not become surety for him.