## PICKLESIMER v. UNITED STATES FIDELITY & GUARANTY CO.

### No. 3163.

Circuit Court of Appeals, Fourth Circuit.
Jan. 12, 1932.

Randolph Bias, of Williamson, W. Va., and Robert S. Spilman, of Charleston, W. Va. (Price, Smith & Spilman, of Charleston, W. Va., on the brief), for appellant.

Wells Goodykoontz, of Williamson, W. Va., and Fred O. Blue, of Charleston, W. Va. (Blue, Dayton & Campbell, of Charleston, W. Va., and Goodykoontz & Slaven, of

Williamson, W. Va., on the brief), for appellee.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge.

The Day & Night Bank of Williamson, W. Va., a state institution, went into the hands of Hayes Picklesimer, receiver, by appointment of the state commissioner of banking on April 7, 1925. On December 22, 1926, the receiver brought suit in the circuit court of Mingo county, subsequently removed to the District Court of the Southern District of West Virginia, against the United States Fidelity & Guaranty Company, a Maryland corporation, to recover upon two bonds of indemnity whereby the bonding company agreed to make good to the bank any pecuniary loss of money it might sustain by reason of fraud or dishonesty of W. P. T. Varney, its vice president. The first bond was dated June 5, 1924, and indemnified the bank against loss to the extent of $25,000; the second bond, dated March 4, 1925, was in the sum of $15,000. The receiver claimed a loss of $8,335.21 under the first bond; and a loss of $29,850.53 under the second. The bonding company filed pleas denying liability. By written stipulation of the parties, a trial by jury was waived, and it was agreed that the issues of fact and questions of law arising should be tried and determined by the court without the intervention of a jury, and the action was referred to a special commissioner appointed by the court to take the testimony and to report to the court his findings of fact and conclusions of law, together with any exceptions thereto by either party, for the consideration and action of the court. See Barnes West Virginia Code 1923, c. 129, § 10; West Virginia Code of 1931, c. 56, art. 7, § 10.

The commissioner reported that the receiver had failed to show that any losses claimed were sustained during the life of the first bond. This finding was sustained by the District Judge, and, since its correctness is established by the proof and is not seriously disputed by the appellant, we need not further consider it. On the second bond, the commissioner found that the bank had suffered a loss through Varney's fraudulent acts during the period covered by the bond in an amount exceeding the full penalty thereof; but he nevertheless decided that no recovery could be had. He held that the bond was invalid because the allegations of the receiver, in a bill of complaint filed by

him in a chancery suit in the state court against certain officers of the bank to recover for losses sustained by reason of their neglect and misconduct, showed that officers of the bank had made untruthful statements in the application for the second bond with reference to Varney's past behavior and services as vice president of the bank.

Exceptions to the report were filed by both parties to the suit. The District Judge found for the defendants on both bonds, sustaining the commissioner completely as to the first bond, but holding that the second bond was invalid for a reason that did not seem sufficient to the commissioner. The District Judge based his decision directly upon a statement by A. B. Scott, president of the bank, called "employer's declaration," made on the 4th day of March, 1925, in the application for the second bond for the purpose of inducing the company to execute it. The statement reads:

"The foregoing applicant (Varney) has been in the service of the undersigned employer 5 years and ———— months and the duties required have always been performed in a faithful and satisfactory manner. The accounts were last audited on the 24th day of Feb. 1925, and were correct in every particular. There has never come to the notice or knowledge of the employer any act, fact or information tending to indicate that applicant is negligent, unreliable, deceitful, dishonest or unworthy of confidence. As far as the employer knows, applicant's habits are good and the employer knows no reason why you cannot safely assume the suretyship applied for.

"The above and foregoing statements and representations are made for the purpose of inducing the United States Fidelity and Guaranty Company to execute said bond."

The District Judge made a special finding of fact to the effect that when the statement was made, the bank already knew that Varney was negligent, unreliable, deceitful, and unworthy of confidence, if not actually dishonest; and, since the bond provided that, if any statements made in the schedule furnished by the employer to the company were untrue, the bond should be void as to the employee to whom the statement referred, the District Judge held that the receiver could not recover on the second bond. The receiver excepted to this finding and appealed. There is abundant evidence to support the special finding of fact; we need only to summarize the evidence bearing on

the knowledge of the bank when the application for the bond was made.

The Day & Night Bank of Williamson was organized under the laws of West Virginia on March 29, 1919. In the following year, John H. Greene became the president and served until March 4, 1925. On that day, A. B. Scott, who had been a director for many years, succeeded to the office of president and held it until the receiver was appointed. Varney was a director of the bank from its organization until March 24, 1925. He was also cashier from the beginning until June 5, 1924. He then became vice president, and the first bond sued on in this case was given. He remained vice president until January, 1925, when he failed of election. Shortly thereafter, he got control of the stock of the bank; and on March 4, 1925, he was reelected vice president, and the second bond in suit was given.

The receiver claimed losses under the second bond amounting to $29,850.53, arising from various forgeries, bad checks, overdrafts, and other improper actions of Varney after the bond was given. We shall confine our attention, however, to improper conduct on the part of Varney prior to March 4, 1925, and then known to the officers of the bank.

At the outset, it should be noticed that under the law of West Virginia (Barnes West Virginia Code 1923, c. 54, § 79a (1), a loan of more than 20 per cent. of the capital stock, surplus, and undivided profits of a state bank to a single individual was forbidden; and it was further provided that no officer, director, or employee of a bank should borrow directly or indirectly from the bank any sum of money, without the written approval of a majority of the board of directors or discount committee thereof, and also that, if any officer, director, or employee of the bank should own or control a majority of the stock of any corporation, a loan to that corporation should be considered for the purpose of the statute as a loan to the officer, director, or employee.

Varney dominated certain coal companies, which were large borrowers from the bank. They were known as the Ira Coal Company, Tug Valley Fuel Company, and Bailey Thacker Coal Company. He owned or controlled a majority of the stock of the Ira Coal Company. He used his position as cashier of the bank to extend these companies credit far beyond the legal limit; and his activities in their behalf were disclosed to the bank by an examination by state bank examiners on October 2, 1922. The result of their investigations were summarized in a letter of October 4, 1922, written by the state banking commissioner of West Virginia to the president of the bank after the examination had been completed. The commissioner said:

"Briefly, I feel that Mr. Varney, your Cashier, is using entirely too much of the Bank's money for his own account and the account of his coal companies. On day of examination Mr. Varney was indebted to your bank in the sum of $7,950.00 directly and was endorser on paper amounting to $17,518.47. In addition to this Mr. Varney's account was overdrawn on day of examination in the sum of $1,468.11, and it seems from the report made by the Examiners that Mr. Varney's account is continually overdrawn.

"I have no disposition to embarrass Mr. Varney in any way, but at the same time I am forced to advise you very candidly that Mr. Varney's indebtedness to your bank and the indebtedness of his different companies must be put in reasonable bounds, and I am further advising that Mr. Varney must not continually overdraw his account and must handle his own affairs with the bank just as he expects the affairs of his other customers to be handled. No officer or director of a bank should take advantage of his position as such officer or director.

"I am also calling your attention to the indebtedness of the Tug Valley Fuel Company, of which Mr. Varney is president and a large stockholder. This company was indebted to your bank on day of examination in the sum of $28,489.39.

"The Banking Laws of this state provide that no bank can loan over 20 per cent. of its capital, surplus and net undivided profit account to any one corporation, firm or individual. Your limit on loans on day of examination was approximately $13,500.00.

"I am calling your attention, therefore, to the fact that the loans and discounts held by the bank of the Tug Valley Fuel Company amounted to approximately 43 per cent. of your capital and surplus, or over twice the amount that you could legally loan to any one.

"It seems, from the report submitted, that some of this indebtedness was made up of trade acceptances endorsed by other companies. This does not help the situation. When an individual, firm or corporation has borrowed up to the legal limit the bank has no right or authority to accept any more

paper of that concern, no matter if the concern did not receive the benefit of the proceeds.

"I am advising, therefore, that the indebtedness of the Tug Valley Fuel Company must be immediately reduced to the legal limit and must be kept so.

"On day of examination overdrafts were being carried amounting to $9,686.51. Large overdrafts appearing on that day were as follows:

| | |
|---|---|
| Bailey Thacker Coal Company | $2,701.60 |
| Ira Coal Company | 1,103.69 |
| W. P. T. Varney | 1,468.11 |
| Teller's Cash Account | 258.97 |
| Jake Henry Coal Company | 3,383.03 |

"It is reported that the overdrafts of the Bailey Thacker Coal Company and the Ira Coal Company and the Jake Henry Coal Company were made good on day of examination.

"It is hardly necessary for me to remind you that overdrafts of this kind should not be accepted, especially against concerns in which Mr. Varney is interested.

"It is reported that your bank executed a note in favor of the Fifth-Third National Bank of Cincinnati for $10,426.90 and attached thereto trade acceptance of the Tug Valley Fuel Company but the examiners report that this had not been credited upon day of examination.

"I am calling your attention, therefore, to the fact that the bank is rediscounting and borrowing money to take care of Mr. Varney's excessive loans to his own companies. A situation of this kind will not be countenanced by this department. * * *

"Referring again to the matter of Mr. Varney's indebtedness to your bank, I am calling your attention to the fact that the Banking Laws of this state provide that loans to the corporations in which an officer or director of the bank is interested, must be classified as a personal loan to such officer or director in the event that the officer or director owns a controlling interest in the corporation. If Mr. Varney owns a controlling interest in the Ira Coal Company or in the Tug Valley Fuel Company, or in any other company borrowing money from your bank, then, in that event, these loans must be classified, as far as our examinations are concerned, as a personal loan to Mr. Varney, and of course would make him a very excessive borrower.

"Information as to whether Mr. Varney does or does not own a controlling stock in these companies must be furnished to this office. Even if Mr. Varney is not a controlling stockholder it would seem from the information submitted that he is a large stockholder and manager of those different coal companies, and these loans, from every standpoint, are not looked upon with any favor at all by this office.

"As noted above, I have no disposition to embarrass Mr. Varney and I trust that this situation can be cleaned up without any embarrassment to him or to the bank, but I desire to impress upon you that vigorous attention must be given to the whole situation and definite assurances must be given to this office immediately that the demands herein contained will be immediately complied with."

This letter was duly received and promptly considered by the entire board of directors, of whom A. B. Scott, who made the declaration on March 4, 1925, was a member. On October 7, 1922, the board answered the commissioner's letter, stating that it concurred in his opinion that Varney was using too much of the bank's funds in connection with his company. The letter took up in detail the complaints in the commissioner's letter, and showed that a number of the things criticized had been corrected and others were in the process of correction.

On March 28, 1923, the commissioner addressed a letter to the board pointing out, amongst other things, that one of the directors was an indorser to the extent of $43,975.70, and Varney was an indorser to the extent of $29,930, and that perhaps these two men were indorsing too much paper. The commissioner said that this was bad practice and was looked upon unfavorably. The letter concluded with an expression of pleasure that there had been a general improvement in the bank since the last report.

A significant situation arose on April 20, 1924. The whole truth of it was not known to the board at the time, but enough was disclosed to throw strong light on Varney's performance of his duties. At the time he was $40,000 short in his accounts, and in addition he had wrongfully withdrawn balances from sundry depositors' accounts in the sum of $12,800 by means of forged checks and otherwise, and he had obligated himself on trade acceptances of the Bailey Thacker Coal Company in the sum of $9,647.82. In order to cover up this situation, he discounted notes in the sum of $62,647.82,

without consulting the board of directors or the officers of the bank. The board did not know of the shortage or the forgeries, but they discovered very quickly that Varney had taken advantage of the absence of the president of the bank from the city to put through the unauthorized discount of the notes. When the president learned of the transaction, he immediately called Varney and expressed disapproval of his conduct. Varney was reminded that in 1922 the bank had been criticized by the state department of banking on account of his loans, and that he had been instructed at the time that he could not discount paper without the assent of the board. The matter was discussed for several days, and finally it was arranged that Varney should sell his residence property for the sum of $25,000 to five persons, four of whom were directors, including the president, Greene, and Scott, his successor in that office, and one of the stockholders of the bank. The conveyance of the property was executed on April 26, 1924; $4,500 of the proceeds were used to cover a loan then upon the property, and the balance was immediately used to take out of the bank paper which Varney had improperly discounted. On April 30 a meeting of the directors was held, and the by-laws of the bank were amended so as to increase Varney's bond as cashier from $10,000 to $25,000. On June 5, 1924, Varney presented his resignation as cashier of the bank and was elected to the office of active vice president, at a smaller salary; and on the same day the first bond in suit in the sum of $25,000 was executed. The officers of the bank relieved Varney of his duties as cashier, as it was thought that it would be to his interest and that of the bank for him to give the greater part of his time to the companies in which he was interested and to try to put them in a better financial condition. Varney remained in the position of vice president until the annual meeting in January, 1925, when he was not re-elected. No explanation was vouchsafed by the officers of the bank for the increase in Varney's bond as vice president.

Events of importance between the spring of 1924 and the execution of the second bond of March 4, 1925, may be summarized as follows: On September 2, 1924, the cashier of the bank was instructed by the board to make necessary arrangements to convert the bank into a national bank, and later the board met to discuss the matter with a national bank examiner. The attention of the board was called to the fact that the directors had borrowed too much money and had indorsed too much paper, in some instances over the legal limit. Specific instances included Varney and one of his fuel companies. In November and December, 1925, the board requested Varney and other directors to reduce their loans and indorsements as much as possible, and certainly within the legal limits, so that a federal charter might be obtained. A meeting of the board on December 31, 1924, decided to eliminate Varney's salary. The annual meeting of stockholders was held on January 13, 1925, when Varney and other directors were re-elected, but on January 15, 1925, when the new board met, Varney was not elected vice president of the bank.

On March 4, 1925, it was announced at the meeting of the board that certain of the directors had sold their stock, and their places were filled by new directors. The new directors then met and elected Scott president and Varney vice president of the bank. These changes were made because Greene and his associates, who controlled the bank, had sold their holdings to Varney. In order to raise the money to make the purchase, he committed certain forgeries and other fraudulent acts which were not discovered until later in the month, and which may not be considered in determining the good faith of the bank's application for the second bond on March 4, 1925, in suit. This bond in the sum of $15,000 was authorized at an adjournment of the meeting of March 4, 1925, and, as we have seen, the employer's declaration in the application was signed by the new president.

The receiver contends that these facts do not show knowledge on the part of the bank at the time of the application for the second bond that Varney was a defaulter; that the surety was not relieved from its obligation on the bond merely because officials of the bank had a suspicion or constructive notice of wrongdoing on Varney's part, or because there was lack of diligence on their part to discover the fraud, or because the surety relied on the fraudulent statements of Varney himself, the principal in the bond. But these considerations are beside the mark. The language of the employer's statement in the application was not limited to a denial of knowledge by the bank of actual default, but amounted to a broad and positive declaration that Varney had always performed his duties in a faithful and satisfactory manner, and that the bank knew of no act or information tending to show that Varney was negligent, unreliable, deceitful, dishonest, or unworthy of confidence. It needs no

further discussion of the evidence to show that the statements in the application for the bond were too broad to be consistent with the truth. The bank knew that Varney had not made merely a technical mistake by borrowing a greater sum of money than was lawful, having reference to the capital and surplus of the bank, but that he had in fact used the funds of the bank for his own purposes contrary to the instructions of the board and in defiance of the statute, and had so jeopardized the standing of the institution as to bring it under the severe criticism of the state banking commissioner. Just before the end, his delinquencies were brought home afresh to the board when, desiring to change the institution to a national bank, it learned that the bank's condition was such that it could not be received as a member of the federal banking system. Varney's known conduct was a reprehensible betrayal of his trust, dangerous to the safety of the bank, and it surely tended to show that he was unreliable and unworthy of confidence.

The decision of the District Judge was well founded upon the facts disclosed and in accordance with the decisions in similar cases. Guarantee Co. v. Mechanics' Co., 183 U. S. 402, 22 S. Ct. 124, 46 L. Ed. 253; National Surety Co. v. Globe Grain & Milling Co. (C. C. A.) 256 F. 601, 4 A. L. R. 552; Fidelity & Deposit Co. v. Courtney, 186 U. S. 342, 22 S. Ct. 833, 46 L. Ed. 1193.

The contention was also made by the receiver that Scott, who had a business arrangement with the agent of the bonding company for a division of commissions on new business secured, acted as agent for the company in placing the second bond in suit. But the bank was already a customer of the bonding company, as shown by earlier bonds; and, according to the weight of the evidence, Scott received no part of the commission, and did not act as the agent of the company with reference to the business of the bank.

Affirmed.