### UNITED STATES FIDELITY & GUARANTY CO. v. COMMERCIAL NAT. BANK OF BRADY, TEX.*

#### No. 6685.

Circuit Court of Appeals, Fifth Circuit.

Jan. 11, 1933.

A. W. Seeligson, of San Antonio, Tex., for appellant.

W. J. Rogers, of San Antonio, Tex., for appellee.

Before BRYAN, FOSTER, and HUTCHESON, Circuit Judges.

HUTCHESON, Circuit Judge.

When this case was here before, though the reversal was put upon the erroneous admission of evidence and the insufficiency of the special verdict, we considered and rejected the contentions appellant made then that the failure of the bank to give notice of the discovery of loss through Davidson, one of the scheduled employees, though no claim for the loss was made by the bank, and its discovery that Graham, another of the scheduled employees, had knowledge of that loss, defeated liability on the bond for all shortages thereafter occurring. U. S. F. & G. Co. v. Commercial National Bank (C. C. A.) 55 F. (2d) 564, 567. In that case we said: "Nor do we agree with appellant that the knowledge of and failure to report Davidson's shortage affects the right of the bank, except as to him, to recover on the bond (American Surety Co. v. Shaw [(C. C. A.) 54 F.(2d) 550], supra), nor that mere proof of knowledge by Graham of Davidson's shortage proves loss through Graham so as to make knowledge by the bank that Graham did know of Davidson's shortage operate thereafter to discharge Graham's bond; though of course if on another trial it is proved that Graham not only knew of, but connived in Davidson's takings, and the bank knew of that conni-

*Rehearing denied February 20, 1933.

vance, a different situation as to his bond will arise."

On the retrial, the District Judge followed these views. Upon a general charge unexceptionable and unexcepted to, and upon evidence supporting the finding that plaintiff's employees had been complicit in causing loss to the bank within the coverage of the bond in the sum of $84,282.72, plaintiff had a verdict and judgment for that sum with interest. This appeal has resulted.

Appellant does claim that the verdict, even on the theory on which the case was submitted, is excessive to the extent of some $6,000 because the evidence was insufficient to show complicity as to some of the employees. Its real attack, however, is as it was on the former appeal, upon the refusal of the trial court to charge as requested by it that the failure of the bank to give notice of the discovery it had made of loss through Davidson, and that Graham had for some time known of this loss without reporting it, had terminated the bond as to, and released it from liability for, a large part of the losses.

We think it plain that the evidence fully supports the verdict in amount, and in its finding that the bank did not know of Graham's connivance in Davidson's takings, and that, unless we were wrong in the view expressed by us on the former appeal, that this must be shown, the judgment must be affirmed.

Appellant presses on us again its former contentions. It urges that because the reversal was put on other grounds, and because the evidence makes this a different case, the view we then expressed did not become the law of the case. It insists that a re-examination will convince of its incorrectness.

We agree with appellant that we are not prevented by the former opinion from an unembarrassed re-examination of the question. American Cyanamid Co. v. Wilson & Toomer Fertilizer Co. (C. C. A.) 51 F.(2d) 665. We have re-examined it in the light of appellant's earnest and vigorous attack. We have arrived at the same conclusion we expressed before. We think a brief statement of the character and contents of the contract sued on, of the undisputed facts surrounding its making and continuance, and of the discovery of losses under it, will serve to show the correctness of that conclusion.

First, as to the contract: Unlike the contracts in those cases in which liability has been denied because the insured has either incorrectly stated, or has failed to disclose, material facts [Picklesimer v. U. S. Fid. &

Guaranty Co. (C. C. A.) 54 F.(2d) 1022, 1023; Green v. Interstate Casualty Co. (C. C. A.) 256 F. 81; National Surety Co. v. Globe Grain & Milling Co. (C. C. A.) 256 F. 601, 4 A. L. R. 552], this contract was not based on any application, nor was it issued in reliance on representations as to the desirability of the risk. The contract in this case expressly negatives such reliance. It provides: "No preliminary application by the employer for this bond is necessary. This contract incorporates the entire agreement between insurer and employer, and no statement of facts in any application or other outside writing which might be claimed to be the inducement for making this bond, shall be allowed in any way to affect its validity."

By its terms the insurer undertook for a price, and without inducement other than the price, an absolute obligation to guarantee the fidelity of the bank's employees, and to insure the bank against spoliation by them. It is settled law that such a contract strictly binds the insurer to compliance with its terms, and that only breaches of conditions in it affecting the very substance of the promise, or proof that the principal knows of criminal or immoral conduct of an agent which unfits him for the position which he holds, will release the surety. American Surety Co. v. Pauly, 170 U. S. 151, 18 S. Ct. 552, 42 L. Ed. 977; Guarantee Co. v. Mechanics' Sav. Bank & Trust Co., 183 U. S. 402, 22 S. Ct. 124, 46 L. Ed. 253; Fidelity & Deposit Co. v. Courtney, 186 U. S. 342, 22 S. Ct. 833, 46 L. Ed. 1193; United States F. & G. Co. v. Walker (C. C. A.) 248 F. 42, 44; Globe Indemnity Co. v. Union & Planters' Bank & Trust Co. (C. C. A.) 27 F.(2d) 496, 497; American Surety Co. v. Shaw (C. C. A.) 54 F.(2d) 550; American Surety Co. v. Bankers' Sav. & Loan Ass'n (C. C. A.) 59 F.(2d) 577. These authorities establish that, when a contract like this has been made by a compensated surety, its protective force cannot be frittered away by general claims like those in this case, that fair dealing required the bank to be alert to discover the infidelity of those whose fidelity the insurer had guaranteed, claims, in short, that the price to the bank for the protection it had purchased was not only the premiums, but constant, sleepless vigilance to prevent loss to the surety. They make it clear that neither negligence nor inattention, nor any failure to discover what by diligence might have been discovered, nothing, in fact, short of actual discovery by the bank of dishonesty or a positive breach of an imperative condition, will defeat claims for loss caused by that dishonesty, unless it is

otherwise provided in the contract. Appellant urges that the contract does otherwise provide by clauses 3 and 4. We turn to a consideration of those clauses.

Clause 3, a notice clause, provides that, upon discovery by the employer of any loss insured under the contract, the employer shall within ten days thereafter give notice, and within three months thereafter file its written claim. We need not concern ourselves here with whether this provision is to be construed as a covenant merely, or as a condition precedent to liability; whether its breach would operate, though the contract does not in terms so provide, to release the surety from liability for the loss it treats of. Wachovia Bank & Trust Co. v. Independence Indemnity Co. (C. C. A.) 37 F.(2d) 550, 551; National City Bank v. National Sec. Co. (C. C. A.) 58 F.(2d) 7; Southern Surety Co. v. MacMillan (C. C. A.) 58 F.(2d) 541, where the authorities are collected and exhaustively discussed. As to the Davidson loss, no claim was made on account of it, and it would be to make the clause operate with a vengeance as a clause of forfeiture if it were given the construction that failure to comply with it would not only defeat the claim for the discovered loss, but would operate as a sweeping divestiture of protection on other losses not discovered. American Surety Co. v. Shaw, supra. As to the Graham loss, since it is undisputed that notice of it was promptly given in 1930, when through Carnes, the new cashier, it had been found out, the notice clause could have no application unless as matter of law the bank, within the meaning of clause 4, discovered the loss through Graham, when in 1928 the Davidson shortage first came to light. The jury has determined this point against appellee. We think the record fully supports its finding.

It is appellant's claim that Crothers, for the bank, made this discovery, and that, knowing of Graham's dishonest connivance and collusion with Davidson, he not only failed to notify the company of it, but effected an increase of his bond; in short, that the bank, through Crothers, knowing that Graham and Davidson had been engaged together in a systematic looting of the bank, retained Graham in its employ without taking any precaution against further thefts, except to increase the coverage of his bond. It is not reasonable to suppose, in fact it is well-nigh impossible to believe, that one himself not complicit in the takings would have done

this. The record as to this not only contains no suggestion of dishonesty on the part of Crothers, but affirmatively shows that by all connected with the case he has been regarded as above suspicion. It in effect compels the conclusion that Crothers was speaking the absolute truth when, after saying that Graham told him after the discovery of the Davidson loss that about a year before that time he had suspected some such condition, he said: "I then thought that Graham was absolutely reliable in every particular. I trusted him implicitly. After Davidson's death I did not suspect Graham, Roberts, Ogden and Campbell as having been connected with the shortage. The first time I suspected them was in July, 1930." The record shows, not as appellant would make it appear, that the coverage after the discovery of the Davidson shortage was increased only on those whom they say the bank should have suspected as unfaithful, but on Crothers as well. It shows also that from the beginning in 1918 of the relations between the bank and the company it had been the custom of the bank, in accordance with the provision of the contract, to add names to the schedule, and to increase coverages, and that during all that time the coverages as to Crothers and Graham, though increased from year to year in amount, were the same. In 1918 they were $1,000. After Davidson's death, their bonds, which had by then been advanced to $5,000, were advanced again, first to $10,000 and later to $25,000. It shows that at no time after the discovery of the losses was there any suggestion made that Crothers was complicit in the losses, or any request made either to reduce or cancel his bond. Crothers, in testifying to his conversation with Graham about the Davidson shortage, stated, apparently using both words in the same sense, of "having the feeling that" at one place in the record, that Graham told him he "had known," at other places, that he told him he "had suspected," the shortage. Whether the bank discovered a loss through Graham was a jury question. It certainly cannot be said, as matter of law, that the inferences which the jury drew from this and the other testimony in the case, that this statement of Graham's to Crothers was not a disclosure to the bank that he had connived in or colluded with Davidson in the losses, and that there was therefore no discovery of loss by the bank, were unreasonable.

The judgment is affirmed.