## MARYLAND CASUALTY CO. v. AMERICAN TRUST CO. *

### No. 7083.

Circuit Court of Appeals, Fifth Circuit.
June 6, 1934.

SIBLEY, Circuit Judge, dissenting.

---

J. Newton Rayzor, of Houston, Tex., for appellant.

A. J. Lewis, of San Antonio, Tex., and Edgar Monteith, of Houston, Tex., for appellee.

Before BRYAN, SIBLEY, and HUTCHESON, Circuit Judges.

HUTCHESON, Circuit Judge.

This suit, brought to recover losses on stock loans, is on a banker's blanket bond insuring appellee against "direct loss * * *" "from any dishonest act of its employees," issued by appellant in February, 1929. The claim is that Ikard, appellee's president, secretly and covinously obtained funds of the bank to finance his stock market operations, carried on in other names, by having persons, known to him to be insolvent, execute notes, while keeping that fact and the fact of his interest concealed from the bank.

The District Judge, who tried the case on a jury waiver, found the facts as plaintiff claimed them to be, and gave judgment accordingly. This appeal challenges the conclusion of the District Judge that the things the president did were dishonest acts, and his further conclusion that the bank suffered direct losses from them.[1]

It is not denied that the matters occurred substantially as plaintiff claims and as the District Judge found they did; in fact, the evidence is all one way. It shows that, desiring to conduct secret market operations with the bank's money, Ikard from time to time solicited and procured each of three persons without sufficient assets or credit to make their paper bankable to join with him in stock purchases, the notes to be made and the stock to be owned ostensibly by the maker, but the transaction in each case to be the joint venture of the maker and Ikard. It shows that the facts of his connection with and interest in the loans, and the speculations they were made to carry on, were sedulously and

effectively concealed from the directors until long after the losses had occurred. There was proof, too, that Ikard directed and controlled the disposition and sale of the collateral, and both the calling and paying of the loans. In particular instances, over the protest of the makers that they should sell the collateral and pay the note, he refused to permit this to be done, holding out for a rise and the secret profit which he planned the ventures for.

Appellant's first claim is that this secret speculation with the bank's funds was not dishonest. There is no merit in this claim. It goes, we think, without saying that it is dishonest for the president of a bank to secretly obtain its funds for speculation, by putting forward others as worthy of credit, while concealing from the bank his interest in the transaction, and this whether or not it be considered that this was a borrowing by the president without the express consent of the directors within the prohibition of the statutes. Insurance against dishonest acts is insurance of fidelity; it is intended to, it does, guarantee openness and fair dealing on the part of the bank's officers. It is intended to, it does, underwrite that the bank's officers shall act with common honesty and an eye single to its interests. It guarantees that the bank shall at all times have the benefit of the unbiased, critical, and disinterested judgment of the president in regard to the loans it makes. It specifically guarantees that the president of a bank will not engage in secret operations for speculative profit, with the bank's money, by making pretended loans to others, these others, only means to his prohibited ends. In the transaction in question, the bank not only did not have the benefit of Ikard's critical and disinterested judgment, it was deliberately deceived by his pretense and stealth. Under the plainest principles of ordinary common honesty and fair dealing, his conduct was dishonest. First National Bank of St. Petersburg v. Gussie Solomon (C. C. A.) 63 F.(2d) 900; United States F. & G. Co. v. Howard (C. C. A.) 67 F.(2d) 382; American Surety Co. v. Shaw (C. C. A.) 54 F.(2d) 550.

---

[1] "Conclusions of Law. A. The obtaining by Ikard of the Trust Company's money under the circumstances hereinbefore set out, and such purchase therewith of such stock, was and is a 'dishonest act' within the meaning of such bond. And this is true whether considered from the standpoint of the Texas statutes relating to banks and banking (Title 16 supra) or otherwise. The placing of the stock as collateral to secure the notes did not clothe it with honesty. The subsequent action by Ikard with respect to such matters, particularly his concealment of his connection with them, also constituted a 'dishonest act' or acts within the meaning of such bond. The losses of the Trust Company were direct losses within the meaning of the bond." Tr. p. 152.

Upon its other point, that the losses were not the direct result of Ikard's dishonesty, we think appellant stands no better. A certain kind of casuistry, a certain subtlety in "metaphysics, that fertile field of delusion propagated by language," may indeed discover a lack of direct causal connection between the dishonest obtaining of the bank's money and the loss which followed that obtaining, in the admitted fact that, had the loans been promptly enough liquidated by sale of the collateral, there would have been little, perhaps no, loss. The law, however, where fiduciary obligations have been breached, is not so subtle; it sees with a clearer view. It holds that the dishonest and secret breach of trust by which money is gotten taints the transaction throughout its course. That unless and until by a full and timely disclosure its getting is purged of the secret and dishonest stealth by which it was obtained, that stealth continues to be the responsible cause of loss of any of it. Had the directors been fully advised about the loan at any time before loss, particularly of Ikard's connection with it, and possessing that knowledge had honestly and deliberately elected to approve and make the loan their own, the original secrecy of its procuring would have been healed, and for losses thereafter occurring the bond would not have been responsible. Until, however, the fatal humor which characterized the borrowings was purged out of them, it continued there, responsible in law and morals for losses the bank sustained on those loans, even if Ikard's only connection with them had been their original dishonest procurement.

But this is not all. The evidence shows, not only Ikard's original dishonest borrowing by a stealthy concealment of his interest, but his continued unfaithful shepherding of the borrowings in his own interest. It shows that he, not only failed to manage them in the bank's interest by liquidating them voluntarily, but, intent on his secret profits, he refused to save the bank by selling the collateral when the maker of the notes demanded that it be done. The law would stultify itself if, splitting infinitesimal hairs, it gave color to the claim appellant makes here. Bank insurance against direct loss through the dishonest acts of its officers extends to secret raidings of a bank president through loans from which the bank ultimately suffered loss. It is not a defense that, if it had known the fact of its president's secret interest early enough, the bank might have extricated itself. To hold otherwise would be to impose upon the bank, as the price for the protection it purchased, not only the premiums it paid, but constant sleepless vigilance to prevent loss to the insurer. United States F. & G. Co. v. Commercial Nat. Bank (C. C. A.) 62 F.(2d) 718; United States F. & G. Co. v. Bank of Thorsby (C. C. A.) 46 F.(2d) 950; Aetna Casualty & Surety Co. v. Austin (Tex. Civ. App.) 285 S. W. 951; Maryland Casualty Co. v. Farmers' State Bank & Trust Co. (Tex. Civ. App.) 258 S. W. 584; United States F. & G. Co. v. Howard, and American Surety Co. v. Shaw, supra. In law, the secrecy and stealth which attended the getting of the money in the first place tainted that getting until the money came back to the bank. In law, the losses from the loans are the direct results of that secrecy and stealth.

The judgment of the court was right. It is affirmed.

SIBLEY, Circuit Judge (dissenting).

The president is no doubt liable to the bank both because he was a secret partner in the transactions and because he failed in the duty of diligence he owed the bank's business. But I think this case against the Maryland Casualty Company fails for want of proof. That company under its contract is no guarantor of the diligence or of the debts of the president, but only agrees to indemnify the bank for direct loss from the dishonest acts of its employees, including the president. The declaration does not even mention his failure more promptly to close out these loans whereby the bank suffered losses. There is room to claim that that failure was dishonest, in that his interests were then secretly opposed to the bank's, and there is evidence that he then concealed it though knowing that in the collection of the loans the bank was relying on his judgment. But the declaration alleges as the only acts of dishonesty the obtaining of the loans. It charges that the president himself advanced the bank's moneys, and that the borrowers were then financially irresponsible and known so to be to the president, who willfully withheld the information from his fellow directors. These charges are not proven. In granting the loans the bank acted, not by its president, but through a discount committee composed of three directors, the president being one. Neither of the three was sworn as a witness. There is not a syllable of proof that the president recommended the loans, that he made any representation about them, or was even present when they were passed on. For all that appears, the other two members, being a quorum of the committee, may have

authorized each loan on its merits. The loans were of ordinary amounts. The borrower in each case was no dummy, but a business man in business. One was working for the bank in its real estate department. Another was a dealer in securities earning about $2,000 per year. The third was a man of substantial property earning from $8,000 to $10,000 per year. The loans were not for gambling on margins, but in each case for the purchase of a stock named in the tendered demand note, to be attached as security with power to sell it at any time. Such a transaction is as legitimate as to borrow money to buy real estate. This purpose was well understood at the time, for the bank's teller, who is not charged with any collusion, testifies that he himself took the proceeds of the loan in each case, paid for the stock, and received it from the seller for the bank. Each loan was regularly entered with its security on the bank's records, and was approved by the board of directors at their next meeting. The dividends on the stocks were received by the bank and applied to the interest. The president did not get and was not to get a dime of money until the bank was paid, nor was the maker of any note to do so. The loans were good loans in the atmosphere of July, August, and September of 1929, and some of them were closed out at a profit. That the president was secretly interested in anticipated profits did not make them any the worse as loans, though, as already stated, it did make him an improper person to handle their collection. There is no evidence that the bank would have considered them bad, or would have refused them because of the president's ultimate interest. Certainly no one intended any injury to the bank or any benefit to the president or to the borrowers at the bank's cost. The transactions as respects the president were not ingenuous, they were not proper, but it seems to me they were not originally dishonest in any fair sense. If the president did not use his influence or his vote on the committee to procure the loans, his mere hope of profiting by the transactions openly carried on with the bank is hardly dishonest. The bank's president and its directors on the committee cannot, as they are doing, by all holding their peace as to what actually transpired in procuring the loans, put the loss on this insurer by innuendo and suspicion. The burden of proof is on the bank. The loans were good enough until the stock market crash in October, 1929, reduced the value of the collateral and broke the makers of the notes, and then only did any one express any dissatisfaction. I cannot make

a dishonest act out of the secret interest in the profits on property to be openly bought with a loan made by others, if that was the only dereliction of this president. I am putting out of mind his concealment of his interest and what may have been the bad faith of his acts as collector of the paper after the crash, with the losses resulting from that, for they are not sued for, and would not uphold so large a judgment if they were. The judgment ought to be reversed.