569 P.2d 857

**J. R. NORTON COMPANY, an Arizona Corporation, Appellant,**

v.

**FIREMAN'S FUND INSURANCE COMPANY, a California Corporation, licensed to do business in the State of Arizona, Appellee.**

No. 1 CA–CIV 3283.

Court of Appeals of Arizona, Division 1, Department A.

July 6, 1977.

Rehearing Denied Sept. 8, 1977.

Review Denied Oct. 4, 1977.

**428**

Jennings, Strouss & Salmon by William F. Haug, David L. Lange, Phoenix, for appellant.

Maupin & Wilson by Harold J. Maupin, Donald R. Wilson, Steven R. Haasis, Phoenix, for appellee.

## OPINION

FROEB, Chief Judge.

The primary issue in this case is whether the dishonest act of an employee was causally related to losses sustained by the employer to a degree sufficient to bring it within the terms of a fidelity insurance policy. The appeal grows out of a lawsuit filed by J. R. Norton Company, the employer (referred to as "Norton") against Fireman's Fund Insurance Company, the insurer (referred to as "Fireman's Fund"). After Norton had presented its evidence at trial, the trial court granted a directed verdict in favor of Fireman's Fund on the ground that, as a matter of law, the evidence as to causation was insufficient to allow the case to be given to the jury. Norton brings its appeal to this court from the order.

The facts shown at trial and necessary for the determination of the appeal may be summarized as follows. Norton was insured by Fireman's Fund under a fidelity insurance policy which protected Norton against:

> Loss of money, securities and other property which the insured shall sustain through any fraudulent or dishonest act or acts committed by any of the employees. . . .

Timely proof of loss was filed under the policy alleging that Norton had sustained loss due to the fraudulent or dishonest acts of Clint Lisk, the manager of Norton's feedlot in Blythe, California.

From August 1969 through July 1970, Clint Lisk concealed at least 360 weight tickets or death slips and knew that the deaths of these cattle were being concealed by substitution of cattle from later acquired feedlots into lots in which cattle had died. Both of these acts kept the true nature of the death losses from Norton for over one year. At the end of the fiscal year 1969–1970, the period of concealment, the records of the company reflected a 6.2% death ratio, when in fact the true death loss was in excess of 12.5%.

Both Clint Lisk and John Norton, III, testified that a company could continue to operate profitably with a 6% death loss.

They also agreed that a company could not continue to operate a feedpen profitably with a 12.5% death loss.

The trial court determined that there was sufficient evidence to support a finding that the acts of Clint Lisk were dishonest and that the dishonesty fell within the purview of the fidelity policy issue to Norton. The court did not believe that there was sufficient evidence of a causal relationship between the dishonest acts and the losses claimed by Norton to justify submission of the liability issue to the jury.

Lisk was hired by Norton in 1962 and became manager of the feedlot with full control. He was responsible for the complete operation of the feedlot, which included receiving cattle, maintaining their health, selling the cattle, hiring cattlehands to work in the feedyards, maintaining records of cattle purchased, lost and sold, and keeping management informed of the cattle in the feedyard and the number which died.

John Norton testified that Lisk's concealment of the death slips and substitution of cattle prevented the management of the company from knowing the actual death losses, the true extent of Lisk's poor management and the true extent of the poor health maintenance of the cattle since 1969. John Norton also testified that the lack of accurate information caused the company to delay taking the effective remedial measures which ultimately reversed the rising death loss ratio.

The highest previous death ratio was 3.8% in 1968–1969. During the fiscal year 1969–1970, based on the records submitted by Lisk, the loss ratio went to 6.2%. John Norton did not like the figure but did not feel it was out of hand. He thought Lisk could reverse it.

In the Fall of 1970, the reported death loss increased to 12.5%. John Norton then knew he had a serious problem. When the true death losses (at an annual rate of 12%) began to appear each month, Norton intensified his efforts, began exercising more supervision over Lisk's work, stopped buying cattle, and began, in early 1971, to look seriously for a replacement for Lisk. He had a difficult time finding an adequate replacement and, when he did find another manager, it took several more months before the new man could assume the position.

In deposition testimony, Lisk admitted that an inventory would reveal he was about 500 head short from that which had been represented. An actual inventory count did show a difference of 451 head. Norton determined that Lisk had concealed death losses from August 1969 through August 1970. The company had been experiencing over a 12% death ratio during this period rather than the 6% reported loss. It had, in fact, suffered a 12% loss for two years rather than one year.

Norton testified that poor management escalated cattle losses. He determined that cattle were dying because the general management of the feedyard, and in particular the health care of the animals, had deteriorated. The employees hired by Lisk were not qualified and were not doing an adequate job. Medicine was being administered without adequate knowledge of its effects and some of the medicine was harmful to the cattle. Due to concealment of facts upon which a management decision could be based to fire Lisk or take other corrective action, the cattle losses were aggravated. J. R. Norton stated that he would have acted a year sooner to implement the actions taken in 1970 and 1971 if he had known he was suffering a 12% loss rather than the reported 6% loss.

Lisk admitted that withholding the death slips was wrong and that he realized Norton would be deprived of important management information.

After Lisk was terminated and the new manager began his programs, the death losses returned within a reasonable time to levels experienced prior to the concealment. Improved management resulted in the reduction of deaths from 12% in 1970–1971 to 6% within one year and 3% within 18 months.

On these facts, we turn to the question of causation.

Fidelity bonds, which are deemed to be in the nature of insurance contracts, are subject to rules of construction applicable to insurance policies generally. 35 Am. Jur.2d, *Fidelity Bonds and Insurance,* § 3, p. 504. The general rule of insurance law is that only the proximate cause of loss and not the remote cause is to be considered in determining whether recovery may be had under a policy of insurance, and that the loss must be proximately caused by a peril insured against. 43 Am.Jur.2d, *Insurance,* § 1182, p. 1100–1102.

The issue of proximate cause is composed of both a question of fact as well as a question of law. The question of fact is whether the actor's conduct in any way brought about the loss. The question of law is whether that conduct, if shown, is too distantly related to the loss to allow legal responsibility to attach to it. The first must be decided by the trier-of-fact and the second by the court, but in the reverse order at trial.

In the present case, it is quite clearly shown that the cattle died not because of the dishonesty of Lisk, but from his mismanagement. If it were limited to this, the losses would not be covered by the policy. However, the fundamental question in the lawsuit is whether the admittedly dishonest acts of Lisk in concealing the actual death losses were themselves a proximate cause of any loss to Norton. If Lisk's concealment prevented Norton from becoming aware of the actual death loss and it is shown that Norton could have and would have taken remedial measures had he known about the situation, then the fact of causation is shown. On this issue Norton presented sufficient evidence which would permit the matter to be determined by the jury.

Should we say that as a matter of law the cause of the monetary losses suffered by reason of the concealment is too remote? We think not. If proven, the losses are indeed a direct result of the dishonest conduct. It is not as though the cattle would have died anyway. If Norton's proof is accepted by the jury, it may be concluded that fewer cattle would have died because the elements causing their death would have been sooner eliminated. For the dishonest acts to be ruled out as a cause of the losses would necessarily imply that the cattle would have died regardless of whether Norton was fully aware of the true situation. That obviously is not the case. We find that the causal relationship, if proven, is sufficiently direct to allow recovery by Norton. The trial court erred therefore in ruling causation out as a matter of law and in granting the directed verdict.

In so holding, we are not referred to extensive case authority by either side. Several cases bear mention, however. In *Zinnel v. United States Shipping Bd. Emergency Fleet Corp.,* 10 F.2d 47 (2d Cir. 1925), the court held it was a jury question whether the presence of a rope would have saved a drowning man. Another case is *Rovegno v. San Jose Knights of Columbus Hall Ass'n,* 108 Cal.App. 591, 291 P. 848 (1930) in which the court found that it was a jury question as to whether a drowning in a public pool would have occurred had a lifeguard been present. While these are tort cases, they nevertheless are supportive of our conclusion here. For other cases in the specific area of fidelity insurance which also tend to support this view, see *Maryland Casualty Co. v. American Trust Co.,* 71 F.2d 137 (5th Cir. 1934); *Arlington Trust Co. v. Hawkeye-Security Insurance Co.,* 301 F.Supp. 854 (E.D.Va.1969); *Prior Lake State Bank v. National Surety Corp.,* 248 Minn. 383, 80 N.W.2d 612 (1957); *State v. Maryland Casualty Co.,* 189 S.C. 405, 1 S.E.2d 516 (1939). Finally, we are referred to one case which presents a fairly close analogy to this case. In *Daniel Grocer Co. v. New Amsterdam Casualty Co.,* 133 Ill. App.2d 488, 266 N.E.2d 365 (1971), plaintiff sued under a blanket bond claiming losses as a result of dishonest and fraudulent acts of the manager of one of his branch stores. The manager's duties included depositing store receipts in a local bank and making written weekly reports to his employer. Overages and shortages were required to be listed in the reports. Shortages developed and the manager covered them out of cash

on hand of the store and falsified the weekly reports by not revealing the shortages for about 90 days. Eventually the employee revealed the shortages to the employer, admitting the weekly reports were incorrect. The employee denied taking any of the monies and there was no evidence he had done so. The court held that a jury question was presented as to whether the reports were a proximate cause of the eventual loss suffered by the employer. The employer's inability to find and correct shortages due to the employee's concealment of the true facts constituted sufficient proof that the loss claimed by the employer resulted from the dishonest act of the employee.

■ Appellant has raised an additional issue on appeal relating to the admissibility of evidence, namely, certain inventory and business records. The fidelity policy provided as follows:

Section 2. This Policy does not apply:

\* \* \* \* \* \*

(b) under Insuring Agreement I, to loss, or to that part of any loss, as the case may be, the proof of which, either as to its factual existence or as to its amount, is dependent upon an inventory computation or a profit and loss computation; provided, however, that this paragraph shall not apply to loss of Money, Securities or other property which the Insured can prove, through evidence wholly apart from such computations, is sustained by the Insured through any fraudulent or dishonest act or acts committed by any one or more of the Employees; . . .

On the basis of this provision, the trial court denied admission of the records into evidence. In view of our decision upon the first issue requiring a new trial, it is appropriate that we now state the rule of admissibility concerning this evidence.

While there is some conflict in the reported cases, we hold, with what appears to be a majority view, that under such a policy provision the plaintiff must first make a prima facie showing, other than through inventory computation or profit and loss computation, that some loss has occurred which is causally related to the insured misconduct of one or more employees. Having done so, inventory computations and profit and loss computations may be introduced to corroborate the loss and to prove the amount. *NIB Foods v. Insurance Co. of North America,* 63 Mich.App. 680, 234 N.W.2d 725 (1975) (see also the numerous cases cited therein for this principle). From the record before us in the present case, we find that Norton has made such a showing, thereby justifying the introduction of inventory and accounting records which it maintained in the course of its business. We note in passing that at least one case has drawn a distinction between a physical inventory of specific items and a "computed" inventory for the purpose of the policy exclusion provision, pointing out that the former would not be affected by the policy exclusion. *Popeo v. Liberty Mutual Insurance Co.,* Mass., 343 N.E.2d 417 (1976). As we are not asked to draw such a distinction here, we need not concern ourselves with it, except to point out that the *type* of inventory proof involved in a given case may well determine whether it falls under the exclusion provision of the policy. Finally, appellant asserts that the inventory records and accounts would be admissible in evidence without regard to the policy exclusion because they were offered to prove the causal relationship between concealment of the cattle deaths and losses sustained by Norton. Since we have found that the proof presented at trial satisfied the requirements of the exclusion in the policy, we need not consider whether the records would be admissible on the issue of causation alone.

For the foregoing reasons, the directed verdict is set aside and the case is remanded for a new trial.

NELSON and HAIRE, JJ., concur.