**ARLINGTON TRUST COMPANY, Inc.,**
**Plaintiff,**

v.

**HAWKEYE–SECURITY INSURANCE**
**CO., Defendant.**

**Civ. A. No. 4625.**

United States District Court
E. D. Virginia,
Alexandria Division.
June 20, 1969.

James H. Simmonds, Arlington, Va., for plaintiff.

Henry R. Furr, Falls Church, Va., of counsel, J. Harry Welch, Washington, D. C., for defendant.

## MEMORANDUM OPINION

OREN R. LEWIS, District Judge.

The bank (Arlington Trust Company) lost a considerable sum of money on certain loans made through its Bill of Lading Loan Department. These losses allegedly resulted from the dishonest, fraudulent or criminal act of one of its assistant vice presidents then in charge of that department.

Claim was timely filed with Hawkeye (Hawkeye-Security Insurance Co.), the insurance carrier on the bank's blanket bankers' bond—the claim was denied—this suit followed.

The Court's findings follow.

For some time prior to October 1960, Paul E. Darcey had been working for the Old Dominion Bank of Arlington in its department handling the financing of government bills of lading. The Arlington Trust Company was not then engaged in this type of banking activity.

Mr. Darcey explained this type of financing to several of the senior officers

of Arlington. They became interested and shortly thereafter employed him as an assistant vice president to organize and head up a new department to handle this type of loan.

The loans in question were to be ninety-day notes signed by the carrier-borrower—they were to be secured by United States government bills of lading—interest was to be collected in advance—it was anticipated that the United States would pay these bills of lading within thirty days.

The loan papers were to be processed through the bank to insure that the payments by the United States would be sent directly to the bank. This was to be accomplished by having the carriers' checks mailed in care of the bank at the address shown on the voucher. Upon receipt, the bank would apply the check to the loan in question via a power of attorney signed by the carrier authorizing the bank to so do.

This collection procedure was so set up because both the carrier-borrower and the bank knew that the United States would not honor direct assignments of the bills of lading to the bank.

Mr. Darcey prepared the forms he deemed necessary for the handling of this type of financing. They were submitted to the bank's counsel for approval. These forms referred to bills of lading for hauling household goods.

The Board of Directors of the bank adopted and approved the procedures set up by Mr. Darcey for establishing the new department for the handling of this type of loan and authorized him to make ninety-day loans to approved carrier borrowers, said loans to be secured by government bills of lading. Board minutes approving lines of credit for carrier borrowers were exhibited to Mr. Darcey and initialed by him.

Mr. Darcey opened the new department and personally dealt with the carrier borrowers and handled all of the paper work for some time. As the business grew additional help was employed. These employees were trained and worked under Mr. Darcey's direct supervision. Mr. Darcey approved all loans by placing his initials on the notes. If the loan exceeded his authority he added the initials of the authorizing body. He prepared written reports at the end of each month, headed "Bills of Lading, Monthly Report," reflecting the condition of the Bill of Lading Loan Department. These reports were submitted to the senior vice president of the bank through the month of October 1964. This vice president, Mr. Embrey, left the bank in November of 1964. No report was submitted for that month.

Beginning with the month of December 1964 these reports eliminated the past due accounts column. This modification was made absent any official authority. The reports prepared for the months of March 1964 to September 1965, inclusive, indicated very few past due accounts.

In addition, Mr. Darcey made other oral and written reports from time to time re the condition of the Bill of Lading Loan Department to the Board of Directors and to the Executive Committee of the bank. He never at any time told the officers or directors of the bank that he was having collection or other difficulties in his department. To the contrary, he told them in substance that everything was just fine.

The bank did not assign a senior officer to check Mr. Darcey's work or make any special audits of his department in order to see that he was following the instructions of the Board.

Anticipated profits were not forthcoming and the bank indicated during the latter part of 1965 that it was considering phasing out the department. Mr. Darcey resigned, effective the end of that year. Some six months prior thereto he organized a corporation to handle this type of financing. He took one of the bank's employees with him and proceeded to do business with many of the bank's then carrier borrowers.

Another officer of the bank took over the operation of the Bill of Lading Loan

Department as of January 1966 for the purpose of phasing it out. The bank officials then learned for the first time of the irregularities here complained of. Hawkeye was notified by letter dated January 13, 1966. Proof of claim was filed June 21, 1966 for losses in the amount of $699,681.62.

The bank's audit made after Mr. Darcey left its employ disclosed that he had made numerous loans on storage accounts, agency shipments and on letterhead billings to other carriers, none of which were authorized by the Board of Directors or the Executive Committee of the bank—Mr. Darcey says he explained to Mr. Embrey when they were discussing the opening of the department that some of the loans would be on storage accounts—this Mr. Embrey denied.

Many loans Mr. Darcey made were in excess of the approved lines of credit—some without any approved credit.

Overdue loans were brought up to date by renewal notes, in some cases by two or three renewals—all without authority or knowledge on the part of the bank.

Certain carrier borrowers were allowed to process their own paper, sending the bank only carbon copies of vouchers or other billings.

In some cases paper returned by the Government for correction were remailed to the borrowers without proper notation being made on the bank's records, resulting in the checks being sent to the borrowers instead of in care of the bank.

Three of the larger borrowers were allowed to receive their payments direct from the Government and to use their own checks in repaying their loans. In many cases the company checks bore no relation to the collections received or the balances then due on the notes.

Two borrowers were allowed to execute blank bank notes to be filled in by bank employees in order to keep their accounts current.

Some of the renewal notes were not forwarded to the Audit Department and some were not recorded on the daily journal sheets—Mr. Darcey directed an employee to fill in one of the notes, signed in blank, and not to list it on the monthly report.

The Court finds that the monthly reports were prepared under the direction of Mr. Darcey and that he knew or should have known that they did not list the true number of past due accounts—he checked the past due accounts personally on many occasions and turned down the cards for the ones he wanted listed—on one or two occasions he directed an employee not to list certain past due accounts.

The monthly reports were inaccurate in other respects, namely, renewal notes were comingled with and listed among the new notes—the total amount of the renewal notes was included in the payments received column.

The Court finds that the losses complained of in this suit resulted from the unauthorized loans made or approved by Mr. Darcey.

The original losses were reduced through the bank's efforts to $487,746.-20 as of the date of the trial, at collection costs of $36,925.66. This was accomplished by the bank taking renewal notes and consolidating some of the loans into installment loans, by taking collateral security and by filing suits for collection—Hawkeye advised the bank by letter dated February 1, 1966 to take all possible steps consistent with good banking practices to collect these loans.

Hawkeye (under its fidelity bond covering the bank's employees) undertook and agreed to indemnify and hold the insured (Arlington Trust) harmless for any loss (not exceeding $700,000.00) through any dishonest, fraudulent or criminal act of any of its employees.

"Dishonest" and "fraudulent" as used in fidelity bonds of this type are broader and more comprehensive than the term "criminal" as used therein—

they include acts which show a want of integrity or breach of trust. See Brandon v. Holman, 41 F.2d 586 (4th Cir. 1930).

■ Knowingly making unauthorized loans is such breach of trust:

Mr. Darcey approved many loans that exceeded the borrowers' approved line of credit—some without any approved credit. He granted loans on storage accounts, agency shipments and on letterhead billings to other carriers, none of which were approved by the Board of Directors or the Executive Committee of the bank.

■■ An essential element of either fraud or dishonesty is an intent to deceive. Such intent may be inferred from the officer's reckless disregard. See Logsdon v. United States, 253 F.2d 12 (6th Cir.1958). See also Glens Falls Indemnity Company v. National Floor & Supply Company, 239 F.2d 412 (5th Cir.1956).

■ Knowingly making false reports —written and oral—to his superiors constitutes clear evidence of intent to deceive:

Mr. Darcey told the Executive Committee on numerous occasions that collections were good and that he was having no difficulties in his department when he then knew that many loans were overdue and unpaid—he covered this up by taking renewal notes and listing them as collections —he deliberately left many of the past due accounts off the monthly reports.

Evidence of Mr. Darcey's reckless disregard of the interests of the bank included:

Allowing certain borrowers to process their own paper—allowing some to receive their payments direct from the Government and to repay their loans with their own checks—permitting executed blank notes to be filled in by bank employees so that these accounts could be listed on the records as current.

Telling an employee to fill in the amount on one of the signed-in-blank renewal notes and not to list this note on the bank's records is clearly dishonest.

Viewed in its totality, Mr. Darcey's conduct in managing the Bill of Lading Loan Department for the Arlington Trust Company amounted to much more than mere negligence, mistake, error in judgment or incompetence. It was willful and flagrant violation of a fiduciary trust to the detriment of the bank. See Glens Falls Indemnity Company v. National Floor & Supply Company, supra. The dishonest and fraudulent acts on the part of Mr. Darcey touched all phases of the Bill of Lading Loan Department and spanned the greater part of his employment. They caused the bank losses here complained of.

■■ Hawkeye seeks to avoid its liability under the bond on the alleged contributory negligence of the bank in not adequately supervising Mr. Darcey and in not setting up proper accounting and bookkeeping procedures. This defense must fall on two grounds—(1) Failure of the defendant to prove the charge. The bank admittedly relied upon the experience, integrity and honesty of Mr. Darcey in reporting his activities to the Board of Directors and Executive Committee. They set up no special procedures to check or audit his work. Although the end result proved them wrong in not so doing, it is not enough to establish contributory negligence on the part of the bank. (2) Negligence on the part of the bank, if found to exist, is not sufficient to defeat recovery under the fidelity bond in question.

"* * * [N]either negligence nor inattention, nor any failure to discover what by diligence might have been discovered, nothing, in fact, short of actual discovery by the bank of dishonesty, or a positive breach of an imperative condition, will defeat claims for loss caused by that dishonesty, unless it is otherwise provided in the contract." See American Employers'

Insurance Company v. Cable, 108 F.2d 225 (5th Cir.1939).

Next, Hawkeye claims that it is entitled to a one thousand dollar deduction on the loss from each note—not a one thousand dollar deduction from the overall loss. This Court does not so read the policy and riders attached thereto. The losses here sustained did not result from a single dishonest or fraudulent act or from a single transaction (note). The losses resulted from a series of continuing dishonest and fraudulent acts on the part of the covered employee touching all phases of the Bill of Lading Loan Department.

The bank's efforts to mitigate its losses after discovery of Darcey's dishonest acts by consolidating certain loans into installment loans and by taking additional securities and endorsements on some of the other loans does not bar it from collecting its net losses from Hawkeye, especially so since Hawkeye authorized the bank to take all possible steps consistent with good banking practices to collect these loans. Further, the fidelity bond here sued on is basically a contract of insurance and indemnity rather than a contract of suretyship.

The bank is entitled to a judgment for the net losses resulting from the dishonest and fraudulent acts of its employee, Paul E. Darcey, plus reasonable counsel fees and expenses incurred in reducing the said losses, together with six per cent interest on the losses from the date said losses were determined. The bank will, of course, reduce the amount proved at trial, namely, $487,746.20, by such amounts, if any, that have been collected since that date, and will assign the remaining uncollected notes to the insurance carrier.

Counsel for the bank should prepare an appropriate order in accordance with this memorandum opinion, submit it to counsel for the defendant for approval as to form, and then to the Court for entry.