**MIAMI NATIONAL BANK, a United States banking association, Plaintiff,**

v.

**The PENNSYLVANIA INSURANCE COMPANY, a Pennsylvania corporation, and Royal Indemnity Company, a New York corporation, Defendants.**

No. 68–514–Civ–TC.

United States District Court, S. D. Florida.

July 14, 1970.

Harrison & Kornbluh, and Howard R. Hirsch, Miami, Fla., for plaintiff.

Dixon, Bradford, Williams, McKay & Kimbrell, Miami, Fla., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CABOT, District Judge.

Final hearing in this cause was held before the Court sitting without a jury on April 27, 28, 29 and 30, and on May 4 and 5, 1970, on the amended complaint and answer and on the third party complaint and answer.

This is an action by the plaintiff, Miami National Bank (Bank), to recover damages as a result of a loss which the Bank claims it sustained as a result of the dishonest, fraudulent, or criminal act of its employee, the third party defendant, Kenneth M. Harris (Harris). The Bank claims that this loss is covered by and it is entitled to recover damages under two bankers blanket bonds issued by the defendants, The Pennsylvania Insurance Company and Royal Indemnity Company (Sureties). The Sureties have brought a third party action against Harris on a common law right of indemnification.

On consideration of the evidence and the written and oral advices of counsel, the court makes the following findings of fact and reaches the following conclusions of law:

### THE PARTIES AND THE BONDS IN SUIT:

1. The plaintiff, Miami National Bank, is a national banking association having its principal place of business in Miami, Florida, where it carries on a commercial banking business.

2. The defendant, The Pennsylvania Insurance Company, is a Pennsylvania corporation having its principal place of business in New York, New York, and is licensed to do business in the State of Florida, including the furnishing for compensation of surety and indemnity bonds.

3. The defendant, Royal Indemnity Company, is a New York corporation having its principal place of business in New York, New York, and is licensed to do business in the State of Florida, in-

cluding the furnishing for compensation of surety and indemnity bonds.

4. The third party defendant, Kenneth M. Harris, is a resident and citizen of Miami, Florida, and was at the relevant times employed by the Miami National Bank as Vice President in charge of the Installment Loan Department.

5. Effective the 26th day of March, 1964, The Pennsylvania Insurance Company issued its bankers blanket bond to the Bank, whereby it agreed to indemnify the Bank in an amount not exceeding $97,500.00 from losses sustained and discovered, as set forth in the bond. Effective the 26th day of March, 1964, Royal Indemnity Company issued its bankers blanket bond to the Bank, whereby it agreed to indemnify and hold harmless the Bank in an amount not exceeding $1,400,000.00 against losses sustained and discovered, as set forth in the bond. Both of these bonds are standard forms of bankers blanket bonds, contain identical provisions, and indemnify the Bank against:

Any loss through any dishonest, fraudulent or criminal act of any of the employees, committed anywhere and whether committed alone or in collusion with others, including loss of property through any such act of the employees.

Each bond further provides:

The underwriter will indemnify the insured against court costs and reasonable attorneys' fees incurred and paid by the insured in defending any suit or legal proceeding brought against the insured to enforce the insured's liability or alleged liability on account of any loss, claim, or damage which, if established against the insured, would constitute a valid and collectible loss sustained by the insured under the terms of this bond. Such indemnity shall be in addition to the amount of this bond.

Other provisions of the bonds relevant to the issues raised are:

At the earliest practicable moment after discovery of any loss hereunder the insured shall give the underwriter written notice thereof and shall also within six months after such discovery furnish to the underwriter affirmative proof of loss with full particulars.

All claims of loss asserted by the Bank arose during the period that the bonds were in effect.

## THE NATURE OF THE CLAIM:

6. The Bank seeks to recover for losses sustained as a result of acts of its employee Kenneth M. Harris that were dishonest, fraudulent, or criminal within the meaning of the provisions of the bonds. Harris, in his capacity as Vice President in charge of the Installment Loan Department of the Bank, disbursed loan proceeds to Mutual Leasing Corporation (Mutual) during the period of mid-November, 1965, through April, 1966, of an aggregate sum in excess of $1,500,000.00. The defendants contend that the Bank has failed to establish liability based on the acts of Harris and that, in any event, the Bank failed to comply with the notice provisions of the bonds, thus releasing the defendants from liability thereunder.

## DISHONESTY OF THE EMPLOYEE:

7. Kenneth Harris, having seventeen years of prior banking experience, was hired by the plaintiff in November, 1964, as an Assistant Vice President. In December, 1964, he was placed in charge of the Installment Loan Department of the Bank. During 1965 the Bank was under close scrutiny of federal bank examiners and, because of its precarious financial status, at one time had been instructed to cease making loans until further notice. However, Harris was later made aware by other bank officers that the Bank was desirous of substantially increasing the loan volume of the Installment Loan Department.

8. Mutual Leasing Corporation, newly formed at about this time, was interested in obtaining financing for its operation. Mutual's principal officers were Joseph Lubin, President, and Sidney Stern, Vice President. Their plan, involving a minimum of capital outlay,

was to purchase new automobiles and trucks, finance the purchase price, and then lease the vehicles to third parties.

9. In October, 1965, Harris met Lubin through the Bank's then President, Vance Foster. Harris had known Stern previously and had assisted him with financing a home improvement business. Harris learned of Mutual's financing requirements and was aware that the corporation had virtually no assets. According to Harris, it was agreed that prior to any loans being made to Mutual, Lubin and Stern would each contribute $10,000.00 to the corporation and that a Dr. Rickles (a cousin of Stern) would transfer to the corporation real property having a value of $100,000.00. Thereupon Harris, in mid-November, 1965, without ascertaining whether these contributions had been made, commenced authorizing loans to Mutual for the purchase of automobiles.

10. By December 31, 1965, Harris had approved and the Bank had advanced in excess of $250,000.00 to the account of Mutual as a result of 68 individual loan transactions. The mechanics of each transaction were substantially that Mutual would purchase a new car from a dealer and the Bank would then finance the purchase with a loan of 110% of the dealer's invoice, plus the cost of the license tag and state sales tax, subject to a limitation of $300.00 over cost. Thus, Mutual purchased the cars using little cash of its own.

11. The limit of Harris's authority from the Bank on loans to any one person or corporation without prior approval of the Bank's loan committee was $10,000.00. Harris was fully cognizant of this limitation on his loaning authority and that it applied as well to the aggregate balance of individual loans.

12. Harris did not apply for nor did he receive authority from the bank loan committee to exceed the $10,000.00 limitation in the case of Mutual, although he had asked the loan committee for such authorization in connection with other loans. This was so even though the great majority of the Installment Loan Department's loan volume was with Mutual.[1]

13. Harris was also aware that, by statute,[2] the maximum amount which could be loaned by the Bank to any one customer was $250,000.00. Indeed, Harris had instructed certain employees in the Installment Loan Department to advise him when Mutual's loan balance had reached that sum.

14. Toward the end of December, 1965, Harris learned that Mutual's loan balance exceeded the statutory maximum. The evidence indicates that, in part at least, Mutual's balance was brought under the statutory limit through the alteration of bank records so as to insert the name of a Mutual employee or another person as "borrower" in place of Mutual.[3]

15. Upon learning that the statutory maximum had been reached, Harris conferred with Stern and Lubin. Harris told them that the only way the Bank could continue to make loans to Mutual was through a "direct sales" method whereby the lessees of the cars would show on bank records as the owner and borrower. Thus Mutual's name would not appear. Ultimately, the following plan was agreed upon. Harris furnished to Stern and Lubin all bank forms necessary for the completion of a loan. When a customer came to Mutual to lease a car, he would be asked to sign these forms in blank, being told that this was "required by the bank." The

---

1. Monthly reports regarding the status of the Installment Loan Department were made to the loan committee but these reports only reflected the department's dollar loan volume in various categories of loans. The reports, made under Harris's direction, did not reflect that the department's major customer was Mutual.

2. 12 U.S.C. § 84.

3. Because there was a maximum period of 45 days after a new loan was written before the first payment was due, most of Mutual's loans had not yet required that a payment be made and were thus not delinquent on December 31, 1965.

customer would thus sign in blank a note and chattel mortgage, a lease, and a credit application which authorized the loan proceeds to be disbursed to Mutual. When the papers were forwarded to Harris, Harris would fill in the note and mortgage for the appropriate amount and cause the proceeds of the loan to be credited to Mutual's checking account. Almost incredibly, in a period of four months, commencing in early January, 1966, approximately $1,400,000.00 was disbursed to Mutual in this manner.[4]

16. During the period these loans were being made, Harris made certain that the payment books were sent to Mutual and not to the listed borrowers. Meanwhile, Mutual continued to lease cars, at increased rates, to the listed "buyers" and others, and would send its own payment booklets to its customers who then made their payments direct to Mutual. When bank payments were due, Mutual remitted to the Bank in lump sum payments.

17. By reason of Harris's close relationship with Stern and Lubin (See Para. 18, *infra*), his control of the Installment Loan Department, the highly irregular procedure employed, and the deliberate circumvention of the statutory loan limit, the court concludes, despite Harris's denials, that Harris knew that Mutual continued to lease cars to persons listed as buyers on the Bank's records.

18. Although it appears that Harris did not have an active financial interest in the operations of Mutual, the evidence showed that Harris did receive the use of an automobile from Mutual and certain favors of value from Isaac Stern. Harris also visited at Mutual's office after working hours for an hour or more at the time as many as three days a week.

19. Essentially, the Sureties contend that the Bank has failed to prove that it suffered a loss as a result of the "dishonest" or "fraudulent" acts of its employee[5] Harris. As stated in Arlington Trust Co. v. Hawkeye—Security Ins. Co., E.D.Va.1969, 301 F.Supp. 854, 857, 858, the terms " 'dishonest' and 'fraudulent' as used in fidelity bonds of this type are broader and more comprehensive than the term 'criminal' as used therein—they include acts which show a want of integrity or breach of trust." Acts, or a course of conduct, demonstrating an intentional breach of trust or a reckless disregard for the interests of the employer would establish "fraudulent" or "dishonest" conduct within the meaning of the bonds. Glens Falls Indemnity Co. v. National Floor & Supply Co., 5 Cir. 1956, 239 F.2d 412, 414; Arlington Trust Co. v. Haweye—Security Ins. Co., *supra*.

20. The employee, Harris, knew that his loan authority was limited to $10,000.00 and that to exceed this sum required prior approval of the loan committee. Yet he grossly exceeded his authority in the case of Mutual Leasing Corporation. It cannot be doubted that Harris did so knowingly and with reckless disregard for the interests of the Bank. Harris commenced making loans to Mutual without determining whether Mutual had any assets whatever. He was aware that Mutual was a newly formed corporation having no established credit. Routine investigation would have disclosed that Mutual's officers, one of whom was a prior acquaintance of Harris, had had difficulty obtaining credit from other lending institutions. From mid-November, 1965,

---

4. There were also instances where a single car was "financed" twice and other instances where the "lessee" never actually signed a note and mortgage, although signed notes and mortgages were in the Bank's files. In some instances a car would be leased to one person and another would execute the note and chattel mortgage. Stern and Lubin were aware that astute businessmen would not readily sign documents in blank, and thus avoided this type of customer. Nevertheless, the success of this deceitful venture is astounding.

5. The Sureties concede that Harris was an "employee" within the meaning of the provisions of the bonds.

through December 31, 1965, Mutual was the Installment Loan Department's major borrower, yet Harris never sought authority from the loan committee to exceed the $10,000.00 limitation, although he did so in other cases. Yet upon this background, Harris loaned over $250,-000.00 to Mutual in the period of a month and a half, and apparently would have continued to advance funds in the same manner were it not for the statutory prohibition.

21. The Sureties contend that Harris did not act "fraudulently" or "dishonestly" in making the 1965 Loans to Mutual because the individul loans were documented and were collateralized by the vehicles that were purchased. But this overlooks the fact that Harris knowingly made unauthorized loans to a single customer in circumstances showing gross and reckless disregard for the interests of the Bank. Knowingly making unauthorized loans is such a breach of trust as will constitute fraud or dishonesty within the meaning of the bonds. Arlington Trust Co. v. Hawkeye —Security Ins. Co., *supra*. *Cf*. Sherwood & Roberts—Kennewick Ins. v. St. Paul Fire & Marine Ins. Co., 9 Cir. 1963, 322 F.2d 70.

22. Harris's role in making the "over the line" loans in 1966 serves as evidence of his prior intent to deceive the Bank as well as establishing separate acts of fraud upon the Bank. (See paragraph 15 for explanation of "over the line" loans.) Here, Harris willfully participated in a scheme specifically designed to defraud the Bank. Harris caused huge sums to be disbursed to Mutual after filling in notes and chattel mortgages signed in blank by third parties. He rarely checked the credit of purported borrowers. He was aware that Mutual continued to "lease" the vehicles to the borrowers and others. Most significantly, he knew that the beneficiary of this scheme would not appear on the Bank's records as borrower. The totality of Harris's conduct as it related to the transactions with Mutual,

from mid-November, 1965, through April of 1966, transcended mere negligence, inadvertence or incompetence. "It was willful and flagrant violation of a fiduciary trust to the detriment of the Bank." Arlington Trust Co. v. Hawkeye —Security Ins. Co., *supra*, 301 F.Supp. at 858. The acts of Harris constitute dishonest and fraudulent conduct within the provisions of the bonds here sued upon.

## DISCOVERY OF THE LOSS AND NOTICE TO THE SURETIES:

23. Mutual Leasing Corporation was listed on certain bank records as the borrower regarding those loans made to Mutual before the statutory limit had been reached (termed by counsel as "under the line" loans). In addition to Mutual's individual loan ledgers that were kept in the Installment Loan Department, all loans made by the Bank, including those made to Mutual, were recorded in a central loan register kept outside the Installment Loan Department. In neither case, however, were Mutual's loans officially segregated from loans made to others. It was not the function of the loan register to total loans made to particular individuals. As noted, monthly reports in installment loan transactions to the loan committee, made under Harris's direction, showed only the dollar volume of loans in various categories. The names of the individual borrowers did not appear in these reports.

24. The evidence showed that the Bank's high level management during the entire period in question experienced several changes in personnel. For this reason and others the loan procedures employed in the Bank were not carefully supervised by the Bank's management. Although certain of the Bank's officers were aware that Mutual was a customer of the Installment Loan Department, those officers and directors charged with ultimate responsibility for loan authorization were not aware of irregularities in the Installment Loan Department

regarding loans to Mutual except as hereafter described.

25. On February 17, 1966, Mutual made application to the Bank for a letter of credit. The application went to Alice Hoffman, a bank employee whose duties included the processing of such applications. As was customary, Miss Hoffman sought to obtain Mutual's total loan balance before seeking authorization to issue the letter of credit. Edward Byrne, an employee in the Installment Loan Department, prepared an adding machine tape showing, as best he could determine, Mutual's total direct and indirect [6] obligations to be about $700,000.00. The letter of credit was authorized and issued, with the Bank holding the amount thereof against Mutual's checking account balance. There is testimony that either that day or the next, George Horvath, Chairman of the Board and member of the loan committee, who was out of town, was informed by telephone of Mutual's loan balance. All of the Mutual loans were current at the time and neither Horvath nor the other bank officers made further inquiry as a result of the letter of credit application.

26. Nevertheless, other employees, particularly Byrne, were suspicious of seeming irregularities in the transactions with Mutual. Byrne, having no responsibility regarding the amount of credit the Bank extended, was primarily concerned with instances where it appeared that one person had financed two or more vehicles. He also noted that it was irregular for Mutual to make lump sum payments on loans where third parties were listed as the borrowers. All such loans were current, however, and for a time Byrne took no affirmative action.

27. On or about April 10, 1966, Byrne spoke to Benjamin Wheeler, Executive Vice President of the Bank, concerning the Mutual account. This interview precipitated further investigation.

28. During the latter part of April, additional concern over Mutual's account arose when Harris presented to the loan committee an uncertified financial statement purporting to reflect Mutual's condition as of March 31, 1966, and requested retroactive approval of the "under the line" loans made to Mutual in November and December of 1965. No such approval was sought of the "over the line" loans, where others were shown as "borrowers," Harris apparently thinking these would go unnoticed by the loan committee. The committee refused to approve the loans but instead caused a former auditor of the Bank, Robert Sax, to go to Mutual's office to examine Mutual's books and records. Sax discovered many of the irregularities heretofore described.

29. A conference attended by members of the loan committee, Harris, Stern, Lubin, and Sax, was held at the Bank on or about April 27, 1966, for the purpose of determining the nature and scope of irregularities in the Bank's transactions with Mutual. On May 3, 1966, the Bank notified the Sureties of a possible loss under the bonds involving Mutual, and that the Bank was exercising its rights under the bonds to an additional twelve months to discover loss covered by the bonds. On October 25, 1966, the Bank forwarded to the Sureties verified proof of loss showing the nature and general extent of losses sustained and expected to be sustained in the future.

30. The bonds provided that the insured was to provide the Sureties with written notice "at the earliest practicable moment after discovery of any loss hereunder. * * * " The Sureties contend that the Bank failed to comply with this provision thereby defeating recovery.

---

6. Byrne had taken it upon himself to tabulate those loans made for the benefit of Mutual under the plan described in Paragraph 15 (called by counsel "over the line" loans), which showed Mutual as the source of the loan, although not the borrower.

31. The evidence shows that the Bank, during the relevant times, was loosely run and poorly managed. Further, certain officers and employees of the Bank gained a general awareness that Mutual was a substantial customer of the Installment Loan Department either by virtue of the nature of their duties at the Bank or as a result of occurrences such as the letter of credit application on February 17, 1966.

■■ 32. It is well settled that the customary rule to the effect that knowledge of an agent or officer of a corporation is imputed to the corporation is not applicable under fidelity bond claims. Phoenix Indemnity Co. v. Union Finance Co., Fla.1951, 54 So.2d 188, 190; Appleman, Insurance Law and Practice, § 6196. Further, negligence on the part of the insured will not defeat recovery under the fidelity bonds in question, since " * * * neither negligence nor inattention, nor any failure to discover what by diligence might have been discovered, nothing, in fact, short of actual discovery by the Bank of dishonesty, or a positive breach of an imperative condition, will defeat claims for loss caused by that dishonesty, unless it otherwise is provided in the contract." United States Fidelity & Guaranty Co. v. Commercial National Bank of Brady, 5 Cir. 1933, 62 F.2d 718, 719–720; American Employers' Ins. Co. v. Cable, 5 Cir. 1939, 108 F.2d 225, 227; Arlington Trust Co. v. Hawkeye—Security Ins. Co., *supra.* See, generally, Appleman, Insurance Law and Practice, §§ 6194–6198.

■ 33. Based upon these established principles, it is clear that actual discovery of Harris's dishonesty occurred on or about April 27, 1966. Notice to the Sureties was given within a few days thereafter in full compliance with the requirements of the bonds in suit.

DAMAGES:

34. Immediately following the meeting of April 27, the Bank employed Sax's firm of certified public accountants to reconcile the records of Mutual and of the Bank. From this time until the middle of June, 1966, Sax and his employees took control of Mutual's premises and, in addition to trying to reconcile Mutual's records, opened mail, made bank deposits, and paid bills on Mutual's behalf. Sax and his staff continued to oversee receipts on the Mutual loans at the Bank until August, 1966, and, until October, 1966, supervised Bank employees in carrying out the procedures established by Sax.

35. Nearly all of the evidence offered by the Bank in support of its claimed losses was presented through the testimony of Robert Sax. Sax, a certified public accountant, was intimately familiar with all of the books and records pertaining to the Mutual loans. The voluminous books, records, invoices, and other data from which Sax prepared the summary sheets from which he testified, were kept in the regular course of the Bank's business and were made available to all counsel well in advance of trial, as were the summary sheets themselves. Sax testified at length and was subjected to intensive cross-examination.

■ 36. In these circumstances, it is clear that Sax's testimony and the summary sheets prepared by him were admissible, competent evidence to prove the loss incurred by the Bank. 28 U.S. C. § 1732; Youngs Drug Products Corporation v. Dean Rubber Manufacturing Co., 7 Cir. 1966, 362 F.2d 129; New Amsterdam Casualty Co. v. W. D. Felder & Co., 5 Cir. 1954, 214 F.2d 825, 828–829; 4 Wigmore, Evidence, § 1230 (3d Ed. 1940).

37. Additionally, beginning in May, 1966, and continuing to the present, the Bank has sought to liquidate the outstanding balances owed by Mutual and by the purported third party purchasers. Several officers and employees of the Bank worked for weeks full time and to the exclusion of other bank duties, in

tracing and repossessing vehicles, collecting accounts, attempting to re-sell repossessed vehicles, and generally servicing and attempting to liquidate the Mutual loans made by Harris.[7]

38. In computing its loss, the Bank determined the amount due on each loan by deducting the unearned interest as of May 31, 1966. This was necessary because the interest for the life of the loans had been added to the cash disbursed to Mutual in computing the face amounts of the notes. The bank then added its collection and liquidation expenses, deducted proceeds of sales, etc., received on the automobiles recovered, and entered the net amounts on its ledger as the sums lost.

■ 39. In circumstances where repossessed vehicles were refinanced by the Bank, credit was given for the new loan amount, regardless of the subsequent disposition of the new loan. Many of these refinanced loans were made to "lessees" in the original Mutual deal and many were not fully collected. The resulting additional losses are not here claimed by the Bank. The Sureties contend that credit should be given them for interest and service charges earned on these second loans. However, it is clear that the Bank is entitled to its earnings on the new loans to original "lessees" or owners, as it would be if the loans were made to new owners. Indeed, it appears that the Sureties would have suffered greater losses had the vehicles been auctioned off for cash as the Bank had a right to do. No contention is made by the Sureties that the Bank sold or refinanced any repossessed vehicles at fictitiously low prices.

40. Of the Bank's funds disbursed to Mutual on the loans, the net unrecovered loss computed at February 22, 1970,

the closing date of the Sax audit, as set forth in Paragraph 38 above is:

(a) $109,826.06 for loans of November and December, 1965 ("under the line loans").

(b) $618,930.30 for loans of January through April, 1966 ("over the line loans").

These are lawful and proper charges against the Sureties.

■ 41. In computing the "under the line" loss of $109,826.06, the Bank reduced the loss by setting off against it the sum of $53,705.50 in Mutual funds which were deposited in a Mutual bank account. However, the Referee in Bankruptcy in the matter of Mutual Leasing Corporation, Bankrupt, Case No. 66–388–BK–WM, filed in this court, ordered this sum, plus an additional sum of $31,735.39, of earlier Mutual funds handled by the Bank, for a total of $85,440.-89, paid over by the Bank to the trustee for the bankrupt. Therefore this $85,-440.89 sum is a lawful and proper charge against the Sureties by the Bank. The parties have stipulated that if any portion or all of this claim (which is now under review) is recovered by the Bank, it will be credited or paid over to the Sureties.

■ 42. The Bank incurred and paid the sum of $25,300.00 in accounting expenses of Landis and Resnick, Certified Public Accountants, in connection with reconstructing the books of Mutual and other necessary expense related to liquidation of the Mutual loans. They paid salaries in the amount of $13,203.37 to officers and employees of the bank during the weeks they were exclusively or partially assigned to recovering these loan losses. Additional expenses incurred and paid in repossessing, servicing, and disposing of repossessed ve-

7. Initially, the Bank thought it would be more expedient to continue to honor the leases made by Mutual. It established a separate corporation ("Minat Corp.") for this purpose so that the Bank's name would not be related to an apparently commercial venture. This corporation, staffed by bank officers and employees, never became operational as a separate entity, however.

hicles and in effecting recoveries were in the amount of $82,610.47. All of these expenses are lawful and proper charges against the Sureties.

■ 43. At the time of the Sax audit, the Bank held funds to Mutual's credit in four segregated bank accounts in the sum of $81,651.22. This sum should be deducted from the Bank's losses. Thus the total sum due the Bank by the Sureties is $853,659.87, plus interest at six per cent from May 3, 1966.

■ 44. There are 69 vehicles which are missing although the Bank has diligently attempted to locate them. Four years having passed since these losses occurred, it seems unlikely that any cars will be recovered. However, should any such recoveries be made, the Sureties are entitled to ownership of the recovered vehicles. Likewise, any payments received by the Bank on the loans after the date of the accounting testified to at final hearing, or any payments hereafter received, should be credited or paid over to the Sureties.

### THIRD PARTY CLAIM FOR INDEMNITY:

Defendant Harris is liable to the Sureties in common law indemnity for the sum awarded plaintiff herein, $853,659.87, plus interest at six per cent per annum.

The parties stipulated that hearing and determination of the attorneys' fees to be recovered under the terms of the bonds should be deferred until after disposition of the issues of liability and damages. Therefore the court will reserve jurisdiction of the parties and the cause for this purpose.

Counsel for plaintiff shall within a reasonable time submit to the court a form of final judgment in accordance with the terms hereof.