### In re CAPTRAN CREDITORS' TRUST, Debtor.

CAPTRAN CREDITORS' TRUST, Club Baha, Ltd., a foreign corporation and Tropical Properties, Ltd., a foreign corporation, Appellants,

v.

David W. McCONNELL, Gerard A. McHale, Jr., and McHale, Ezzell and Co., a Florida professional association, Appellees.

No. 90–719–CIV–T–17(A).

United States District Court,
M.D. Florida,
Tampa Division.

June 17, 1991.

Malka Isaak, Tampa, Fla., Richard W. Epstein, Greenspoon, Marder, Hirschfeld & Rafkin, P.A., Fort Lauderdale, Fla. and Jerome H. Shevin, Miami, Fla., for appellants.

Francis H. Cobb; Chad Whitehurst Browne and Charles William Pittman, MacFarlane, Ferguson, Allison & Kelly, Tampa, Fla., for appellees.

APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF FLORIDA

KOVACHEVICH, District Judge.

This cause is before the Court on appeal from the Final Judgment of the Bankruptcy Court entered in this adversary proceeding in favor of appellees. Chief Bankruptcy Judge Alexander L. Paskay entered Final Judgment on April 17, 1990 upon the Findings of Fact, Conclusions of Law and Memorandum Opinion dated April 4, 1990. 114 B.R. 753.

STANDARD OF APPELLATE REVIEW

Findings of fact by the Bankruptcy Court will not be set aside unless clearly erroneous. Bankruptcy Rule 8013; *In re Downtown Properties, Ltd.*, 794 F.2d 647 (11th Cir.1986). However, appellants are entitled to an independent, de novo review of all conclusions of law and the legal significance accorded to the facts. *In re Owens*, 86 B.R. 691 (M.D.Fla.1988).

FACTS

1. In 1982, Captran Resorts International, Inc. (CRI), a corporation based in Lee County, Florida, was engaged in the business of developing resorts and selling timeshare interests to the public. CRI's president was Keith Trowbridge (Trowbridge).

2. CRI, through its president Trowbridge, entered into a joint venture with Club Baha, Ltd. (Club Baha) and Tropical Properties, Ltd. (Tropical Properties). Tropical Properties is the parent organization of Club Baha, its wholly owned subsidiary. Jack Grobowsky (Grobowsky) controlled Tropical Properties which developed resorts and timeshare interests in the Bahamas.

3. The CRI joint venture with Club Baha resulted in a disagreement and litigation between the parties. Club Baha sued CRI and its president, Trowbridge, asserting fraud and breach of contract involving the development and marketing of a Club Baha timeshare resort in the Bahamas. A lengthy jury trial was held in the Circuit Court for Lee County, Florida. On May 18, 1982 Club Baha obtained a $1.7 million dollar final judgement for compensatory and punitive damages against CRI and Trowbridge.

4. CRI could not pay the $1.7 million Club Baha judgement lien and continue its resort development and timeshare business. Further, CRI could not post a supersedeas bond to avoid losing some, if not all, of its property.

5. On July 16, 1982, CRI filed a voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code. Soon thereafter, CRI and some of its largest creditors, including Club Baha and Tropical Properties, entered into extensive negotiations. The purpose of their negotiations was to ultimately satisfy CRI's creditors and to resolve CRI's problems outside of the provisions of Chapter 11 and the Bankruptcy Court.

6. The negotiations resulted in the "Captran Creditors' Settlement Agreement" (Trust Agreement) which provided that the CRI creditors would form the Captran Creditors' Trust (CCT or Trust). It was later ruled that the Captran Creditors' Trust constituted a business trust under section 101(8) of the Bankruptcy Code. *In re Captran Creditors' Trust*, 53 B.R. 741 (Bankr.M.D.Fla.1985). A copy of the Trust Agreement, a synopsis of its development, and copies of related documents are included in what is referred to as "the yellow book".

7. Appellants allege that appellee McHale negotiated the Trust Agreement for Club Baha. Appellees counter that McHale did not negotiate the agreement for Club Baha. Moreover, appellees contend that Domenic Massari (Massari), appellants' attorney, was instrumental in drafting the Trust Agreement as well as being the chief architect of the legal structure of the Trust. Appellees add that according to Grobowsky, Massari was the major author of the Trust Agreement. In their briefs, appellants do not refute that Massari authored the Trust Agreement.

8. The Trust Agreement was finalized in December, 1982. Based on the settlement, the Bankruptcy Court on December 6, 1982 entered an order granting CRI's motion to dismiss its Chapter 11 case. The Trust was effective following the final agreement.

9. CRI assets, and any debts and liabilities of those assets, including 1400 timeshare unit weeks at five different resort properties; undeveloped land; two mortgage portfolios and a promissory note, were transferred to the CCT to be the Trust res. CRI creditors were to be the CCT beneficiaries. Appellees McConnell, an attorney, and McHale, a Certified Public Accountant (Trustees), were appointed as initial trustees of CCT. CRI retained a residual interest in the CCT properties, if one remained after the liquidation of the Trust assets and after the satisfaction of the interests of the Trust beneficiaries.

10. Appellees McConnell and McHale were both familiar with the parties' businesses before appointment as Trustees. McConnell had significant business dealings with CRI and Trowbridge during the CRI bankruptcy. He was considered closely aligned with CRI and Trowbridge. McHale had previously been retained by Club Baha for financial and economic analysis during its litigation with CRI and

Trowbridge. He was considered closely aligned with Club Baha and Grobowsky. CRI and the CCT beneficiaries sought to balance their competing interests by appointing these Trustees to administer the Trust.

11. A major asset of the CCT was the land of Sanibel Island Beach Club (SIBC), a phased development having multiple buildings upon completion. Building 10 was almost built however it was not certified for occupancy. The Trust owned the land for Buildings 8 and 9. CRI had building permits for Buildings 8 and 9 from before the commencement date of the Trust. The land for Buildings 5, 6, and 7 was also a Trust asset but no building permits had yet been issued. Appellees claim the building permits for Buildings 8 and 9 would have been lost had construction not commenced. Appellant Club Baha, and Grobowsky, claim that they were unaware that CRI had building permits for Buildings 8 and 9. The CCT and CRI were, in effect, dependent on each other concerning the SIBC development.

12. The CRI assets transferred to the CCT were to be marketed and sold. Net sales proceeds were to go to the Trust for the benefit of the Trust beneficiaries. Under the Trust Agreement, CRI was to act as the marketing agent for the CCT properties. In exchange, CRI would receive a 38% marketing fee based on the sale price of the properties it sold. The Trust Agreement allowed the CCT properties to be sold at a 10% discount. Discounts above 10% were deducted from CRI's 38% marketing fee with the Trust always getting 62% of the net sales proceeds. CRI acted as the marketing agent for the CCT properties.

13. Actual sales of the CCT property were handled by a real estate firm owned and controlled by Trowbridge. Northern American Title Insurance Agency, Inc. (NATIA), also owned and controlled by Trowbridge, processed the sales, handled closings, and maintained the records regarding the sales of timeshare unit weeks. All sales records of the Trust properties were under the exclusive control of George Mills (Mills), CRI's controller.

The Trustees received weekly sales reports on Trust inventory, monthly schedules of closed sales, monthly balances in escrow, cumulative showings of use of escrow funds for development and construction purposes, escrow draw approvals and draw requests from the construction company. In addition, the Trustees met approximately bi-weekly with Mills.

14. The Trust Agreement stated the purpose of the Trust as follows:

**Purpose:** This Trust is organized for the primary purpose of liquidating the assets transferred to it with no objective to continue or engage in the conduct of a trade or business.

The Trust Agreement also had a provision regarding Trustee liability. It stated:

**Trustee Liability:** Except for proven dishonesty, a Trustee shall not be personally liable for any act or omission in connection with his duties as Trustee.

As noted above, the Trust Agreement was the product of the parties after extensive negotiations.

15. In 1983, CRI continued developing Buildings 8 and 9 at SIBC. The land for those Buildings was a Trust asset to be liquidated under the stated purpose of the Trust Agreement. The Trustees agreed, at least tacitly, to this activity by CRI, and at no time voiced any objection to it. On the contrary, appellee McHale consented to this development believing it would maximize the return to the Trust beneficiaries. Grobowsky first learned that Buildings 8 and 9 were being developed in July, 1983. It appears that even though the Trust Agreement did not authorize any additional development, the effect of developing Buildings 8 and 9 resulted in a net benefit to the Trust of $1.7 million dollars.

16. In 1983 the Trustees and Grobowsky both tried selling the CCT assets in bulk. No buyer was found. Next, Club Baha suggested that CCT assets be liquidated to the Trust beneficiaries. The Trustees developed a liquidation plan to

distribute the Trust assets in-kind to the CCT beneficiaries. In exchange, the Trust beneficiaries would extinguish their interests in the Trust.

17. CRI, in the Fall of 1983, resisted the in-kind distribution plan and threatened to sue the Trustees if they proceeded with the plan. CRI resisted the plan because it held a residual interest in the Trust properties.

18. In February, 1984 the Trustees filed a suit for declaratory relief requesting that the Circuit Court for Lee County, Florida approve the in-kind distribution. Furthermore, the Trustees sought a temporary restraining order to remove CRI as the marketing agent for the CCT assets. The temporary restraining order was denied. The in-kind distribution plan never materialized.

19. During the pendency of the declaratory suit in the Circuit Court for Lee County, several of the CCT beneficiaries assigned their Trust interest to Club Baha. As a result, Club Baha, controlled by Grobowsky, held over 90% of the beneficial interest of the Trust.

20. On August, 27, 1984, Grobowsky, as president of Club Baha and Tropical Properties, and on behalf of 90% of the Trust beneficiaries, discharged McHale and McConnell from their duties as Trustees. At that time, the Trust had $1,824.00 in cash; $346,268.00 cash in escrow awaiting release of Grobowsky's lien to close; $972,-089.00 in mortgage notes receivable awaiting release of Grobowsky's lien to close; ninety-six timeshare unit weeks at SIBC and four hundred eighty-five timeshare unit weeks in other timeshare resorts. Successor Trustees were appointed.

21. On August 30, 1984, the successor Trustees reached an agreement between Club Baha and the Trust. Their agreement provided that the new Trustees would transfer the bulk of the CCT assets to Club Baha in exchange for Club Baha's interest in the Trust. Throughout the Fall of 1984, Club Baha and the successor Trustees made final plans to execute the agreed upon exchange.

22. In October, 1984, McHale submitted the final accounting of his Trusteeship. The report that McHale submitted was prepared by Mills, CRI's controller. The report was a poor final accounting, merely compiling the Trust assets as they existed when the Trust was created.

23. On January 9, 1985, parties claiming to be CCT creditors filed an involuntary bankruptcy petition against the Trust. That filing held up the plans to transfer the CCT assets to Club Baha. In October, 1985, Judge Paskay ruled that the Captran Creditors' Trust was a business trust and as such it could in fact file for bankruptcy. *In re Captran Creditors' Trust*, 53 B.R. 741 (Bankr.M.D.Fla.1985). On June 26, 1986, CCT consented to entry of an order converting the case to a voluntary Chapter 11. Next, Club Baha and Grobowsky proposed a total liquidation plan as the Plan of Reorganization. That plan was confirmed resulting in an in-kind distribution of the CCT assets to the Trust beneficiaries. That in-kind distribution plan was very similar to the one originally planned by McConnell and McHale.

24. On May 7, 1987, appellants filed a three-count Complaint against the appellees. Count I sought compensatory and punitive damages against McConnell and McHale for alleged breach of their fiduciary duties. In Count II, appellants sought compensatory and punitive damages for professional negligence by McConnell and McHale. In Count III, appellants sought damages and other relief from appellees McConnell, McHale, and McHale, Ezzell, and Co., P.A. (MEC) for their alleged violations of Chapter 772 of the Florida Statutes.

25. McConnell failed to timely file an answer to appellants' Complaint. A Clerk's default was entered against McConnell. Subsequently, appellants filed a three-count Amended Complaint against appellees. Appellants claim in Count I was based on the contention that McHale, in his representative capacity as co-Trustee, breached his fiduciary duty to the Trust

beneficiaries. In Count II, appellants claimed that McHale was liable for damages which appellants allegedly incurred as a result of McHale's purported negligence as a CPA. Count III was the same as Count III in the initial Complaint.

26. Appellants claim that Club Baha's alleged damages through December, 1990 are $2,960,859.30. In addition, they allege that the Trust suffered total damages of $3,267,965.00. Appellees refute the alleged damages, charging that the appellants failed to prove that a breach occurred or that any breach proximately caused their alleged injury. Further, appellees contend that appellants have not proffered evidence to support their damage claims and an exculpatory clause relieves the Trustees of any personal liability.

27. During 1988 and 1989, the Bankruptcy Court held many evidentiary hearings on this dispute. The parties submitted their final arguments in early 1990. Final Judgment was entered on April 17, 1990 in favor of the appellees on Counts I and II of appellants' Complaint. Count III of the appellants' Complaint was dismissed after the final evidentiary hearing. In addition, the Bankruptcy Court withheld entering a final judgment against McConnell who had earlier defaulted.

28. The Bankruptcy Court held that McHale did not breach his fiduciary duties as Trustee of the CCT. The Court also held that the exculpatory clause in the Trust Agreement was not against public policy. It concluded that McHale was not a dishonest Trustee; thus, he would not be personally liable for his activities as Trustee under the exculpatory clause of the Trust Agreement.

The Court based its conclusions on the appellants failure to prove breach of duty and dishonesty as well as upholding the exculpatory clause in the Trust Agreement. The Court withheld entering Final Judgment against McConnell because the appellants offered no meaningful evidence about his conduct as co-Trustee.

## ISSUES

I. WHETHER THE PROFESSIONAL TRUSTEES BREACHED THEIR FIDUCIARY DUTIES UNDER THE TRUST AGREEMENT DIRECTLY RESULTING IN INJURY TO THE APPELLANTS.

II. WHETHER THE COURT SHOULD ENTER A FINAL DEFAULT JUDGMENT AGAINST McCONNELL WHERE A DEFAULT WAS ALREADY ENTERED AGAINST HIM AND WHERE HE BREACHED HIS FIDUCIARY DUTIES AS ATTORNEY/TRUSTEE DIRECTLY RESULTING IN INJURY TO THE APPELLANTS.

III. WHETHER McHALE AND McHALE, EZZELL, & COMPANY P.A., OWED A CPA DUTY OF CARE TO THE APPELLANTS WHICH WAS BREACHED AND WHICH DIRECTLY RESULTED IN INJURY.

## DISCUSSION

I. THE TRUSTEES DID NOT BREACH THEIR TRUST AGREEMENT FIDUCIARY DUTIES TO THE TRUST BENEFICIARIES. MOREOVER, HAD A BREACH OCCURRED, THE TRUST AGREEMENT ESTABLISHES PROVEN DISHONESTY AS THE ONLY BASIS FOR TRUSTEE LIABILITY.

The Court must consider whether the Bankruptcy Court erred in deciding that the Trustees did not breach their duty. Florida law is well settled concerning the duties and liabilities of trustees.

Two Florida Statutes specifically address the general duties of trustees and their standard of care and performance. Section 737.301, *Florida Statutes*, states:

Except as specifically provided, the general duty of the trustee (is) to administer a trust diligently for the benefit of the beneficiaries....

Section 737.302, *Florida Statutes*, addresses a trustee's standard of care and performance as follows:

Except as otherwise provided by the trust instrument, the trustee shall observe the standards in dealing with the

475

trust assets that would be observed by a prudent trustee dealing with the property of another. If the trustee has special skills, or is named trustee on the basis of representations of special skills or expertise, he is under a duty to use those skills.

Florida case law is likewise well settled regarding trustee duties and liabilities. Trustees must exercise due care, diligence, and skill in the administration of the trust. *Thomas v. Carlton,* 106 Fla. 648, 143 So. 780, 785 (1932). Further, trustees are expected to "act in exacting good faith" while carrying out their duties in the administration of the trust. *Voorhies v. Blood,* 173 So. 705, 708 (Fla.1937).

The parties who create a trust can and should include the trustees' standard of care and duties in the trust instrument. Section 737.302, *Florida Statutes,* expressly permits such drafting when it states "Except as otherwise provided by the trust instrument...." In the instant case the Trustees' standard of care and performance was not delineated in the Trust Agreement. The Trust Agreement stated the purpose of the Trust as follows:

**Purpose:** This Trust is organized for the primary purpose of liquidating the assets transferred to it with no objective to continue or engage in the conduct of a trade or business.

■ The initial burden is on the trust beneficiaries to prove that a breach of duty occurred which proximately caused the injury. *Ft. Myers Memorial Gardens v. Barnett Banks,* 474 So.2d 1215, 1218 (Fla. 2d DCA 1985). If that is established, the burden shifts to the trustee to demonstrate that the loss would have occurred in the absence of a breach. *Id.* at 1218. In the instant case, there is an exculpatory clause in the Trust Agreement limiting the Trustees' personal liability except for "proven dishonesty".

The Bankruptcy Court ruled that the appellants did not sustain their burden of proof to establish that McHale breached his duty. That ruling followed many months of evidentiary hearings in which the parties had ample opportunity to present extensive

evidence and testimony. The Bankruptcy Court reached that determination in spite of sharp criticism about McHale's performance as Trustee of the Captran Creditors' Trust.

Rule 8013 of the bankruptcy rules, which this Court applies in this case, mandates the application of the "clearly erroneous" standard of review to the Bankruptcy Court's finding of fact. As stated by the United States Supreme Court:

The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources. In addition, the parties to a case on appeal have already been forced to concentrate their energies and resources on persuading the trial judge that their account of the fact is the correct one; requiring them to persuade three more judges at the appellate level is requiring too much.

*Anderson v. City of Bessemer,* 470 U.S. 564, 574–75, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518, 529 (1985). *See also, Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303 (1985).

■ Finding the Court's reasoning in *Anderson* equally applicable to this case, this Court finds nothing clearly erroneous about the Bankruptcy Court's conclusion that McHale did not breach his duty as Trustee of the Captran Creditors' Trust. The lower Court's conclusion is well supported by the fact that the CCT was not an ordinary Trust. Moreover, McHale had an unenviable task of administering a Trust in which the parties actively participated while protecting competing interests.

■ The next issue for discussion is the exculpatory clause in the Trust Agreement. This court reviews that issue without conceding that a breach occurred to invoke that provision of the Trust Agreement. Technically, any consideration of the exculpatory clause is moot until appellants prove

that a predicate breach occurred resulting in injury.

In the instant case, the Trust Agreement has an exculpatory clause pertaining to Trustee liability. The actual provision states as follows:

> **Trustee Liability.** Except for proven dishonesty, a Trustee shall not be personally liable for any act or omission in connection with his duties as Trustee.

There is no recital in the Trust Agreement defining what the parties meant by dishonesty. The Trust Agreement was the product of extensive negotiations, it was freely negotiated, and the parties were represented. In addition, Massari, appellants' attorney, was instrumental in drafting the Trust Agreement.

Appellants contend that the exculpatory clause in the Trust Agreement is against public policy and repugnant to the law. Moreover, appellants argue that public policy dictates that, at most, the exculpation provision only immunized appellees from liability for good faith errors in judgment.

Exculpatory clauses as a general rule are neither for or against public policy. Each exculpatory clause deserves independent review based on many considerations. Foremost in any review is the language of the exculpatory clause and whether it applies to the instant case. Other factors include, but are not limited to: how the exculpatory clause limits liability, intent of the parties, and the manner in which the exculpatory clause was made a part of the agreement.

The Bankruptcy Court accurately summarized the law concerning exculpatory clauses. The Courts have upheld exculpatory provisions in trust agreements. *Morrissey v. Curran*, 483 F.2d 480 (2d Cir. 1973), *cert. denied*, 414 U.S. 1128, 94 S.Ct. 865, 38 L.Ed.2d 752 (1974). *See also, Kolentus v. Avco Corp.*, 798 F.2d 949 (7th Cir.1986), *cert. denied*, 479 U.S. 1032, 107 S.Ct. 878, 93 L.Ed.2d 832 (1987). Generally, exculpatory clauses are construed according to their plain meaning against the trustee. *Knauer v. Barnett*, 360 So.2d 399, 405 (Fla.1978). Exculpatory clauses will not save a trustee from liability for certain breaches deemed especially reprehensible, for example, willful and intentional breaches, acts of bad faith, dishonesty, acts of gross negligence, and the like. G. Bogert, *Trusts*, 94 (6th ed. 1988).

No Florida cases are cited to define exactly what dishonesty means as it pertains to trustees. Appellants cite *Miami National Bank v. Pennsylvania Insurance Co.*, 314 F.Supp. 858, 868 (S.D.Fla.1970), for the proposition that "dishonest" conduct is a reckless disregard for the beneficiaries' interests. Appellants also cite *Brandon v. Holman*, 41 F.2d 586, 588 (4th Cir.1930) as authority that "dishonesty can be committed by passive permission, or failure to prevent, or helping by not hindering when it is one's duty to prevent or by negligence or by voluntary oversight." The *Brandon* court ruled that *"connivance with others* (emphasis added) may be committed by passive permission, or failure to prevent, or helping by not hindering when it is one's duty to prevent, or by negligence or voluntary oversight." *Id.* at 588. Later in the *Brandon* decision, connivance was defined as "an agreement or consent, indirectly given, that something unlawful shall be done by another." *Id.* at 588. In *Glen Falls Indem. Co. v. National Floor & Supply Co.*, 239 F.2d 412, 413 (5th Cir.1956) the Fifth Circuit stated that "for an act to be 'dishonest' within the meaning of a fidelity suretyship bond, there must exist the element of moral turpitude or want of integrity."

The Bankruptcy Court upheld the exculpatory clause in the Trust Agreement. This Court concludes that as a matter of law, the Bankruptcy Court did not err in upholding the exculpatory clause in the Trust Agreement. The exculpatory clause in the instant case was part of a Trust Agreement produced through extensive negotiations. The parties were in equal bargaining positions, knowledgeable and represented by counsel. Further, appellants' attorney was instrumental in drafting the Trust Agreement. This Court finds no reason to conclude that the exculpatory clause in the instant case is against public policy or repugnant to the law of Florida.

As a related matter, this Court finds nothing "clearly erroneous" about the Bankruptcy Court conclusion that McHale was not a dishonest Trustee.

## II. THE BANKRUPTCY JUDGE DID NOT ERR BY WITHHOLDING A FINAL DEFAULT JUDGMENT AGAINST McCONNELL EVEN THOUGH A DEFAULT WAS ENTERED AGAINST HIM.

Defaults in adversary proceedings are governed by Rule 55, Fed.R.Civ.P. *See* Bankruptcy Rule 7055.

Fed.R.Civ.P. 55 provides:

**Rule 55. Default**

(a) Entry. When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by the rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter the party's default.

(c) Setting Aside Default. For good cause shown the court may set aside an entry of default....

■ Appellee and co-Trustee McConnell failed to timely file an answer to appellants' initial Complaint. A default was entered against him by the Clerk before trial commenced in the Bankruptcy Court. Appellants filed an Amended Complaint after the Clerk's default was entered against McConnell. Appellee McConnell did not attend the trial that was held in the Bankruptcy Court.

The Bankruptcy Court did not enter a Final Judgment against McConnell. It held that appellants presented no meaningful evidence concerning McConnell's conduct as co-Trustee. In light of that, the Bankruptcy Court decided it was inappropriate to enter a judgment against McConnell.

This Court holds as a matter of law that Judge Paskay correctly exercised his discretion in not entering final judgment against appellee McConnell. The disposition of a motion for entry of a default judgment lies within the court's sound discretion. *Mason & Hanger–Silas Mason Co. v. Metal Trades Council,* 726 F.2d 166 (5th Cir.1984). Generally, the Court considers a variety of factors when exercising its discretion for entry of a default judgment. This Court favors decisions on the merits and finds no reason to conclude that Judge Paskay abused his discretion in withholding final judgment against appellee McConnell.

## III. McHALE, AND McHALE, EZZELL & CO., P.A. DID NOT BREACH THEIR CPA DUTY OF CARE TO APPELLANTS.

Section 737.302, *Florida Statutes*, states in part:

... If a trustee has special skills, or is named trustee on the basis of representations of special skills or expertise, he is under a duty to use those skills.

The parties and the Bankruptcy Court do not disagree that Section 737.302 applies to the Trustees of the Captran Creditors' Trust. However, the parties disagree on whether McHale used his CPA skills while a Trustee and whether his CPA firm is includable in this action because McHale acted as a Trustee.

Based on expert testimony, the Bankruptcy Court concluded, that McHale did not fall below the standards of a CPA. Given that conclusion, it follows that McHale's CPA firm is not liable.

■ There are no Florida decisions concerning trustees with special skills or trustees duty to use special skills under Section 737.302, *Florida Statutes*. Based on the plain meaning of the statute, this Court concurs that McHale had a duty to use his CPA skills while he was a Trustee of the Trust.

This Court defers to Judge Paskay as the trier of fact on the evidentiary issues of this case. As noted earlier, Rule 8013 of the bankruptcy rules, mandates the application of a "clearly erroneous" standard of review to the Bankruptcy Court's findings of fact. This Court finds nothing clearly erroneous about the Bankruptcy Court's conclusion concerning whether McHale used his CPA skills. Judge Paskay heard expert testimony from both sides and concluded that appellants did not sustain their burden of proof.

CONCLUSION

This Court, having carefully considered the issues on appeal, and based on the foregoing, concludes that the Bankruptcy Court did not err in its decision denying Appellants' claims. Accordingly, it is

ORDERED that the Bankruptcy Court's Final Judgement entered on April 17, 1990 is AFFIRMED. The Clerk of this Court is directed to enter judgement for Appellees in accordance with this Order, and dismiss the case.

DONE and ORDERED.